# Exhibit A

COMMERCIAL/INDUSTRIAL BUILDING LEASE

BETWEEN

SEAGIS JFK LLC,
a Delaware limited liability company,
as Landlord

and

SSP AMERICA, INC., a California corporation,
as Tenant

DATE OF LEASE: December 5, 2018

165-35 145th Drive
Jamaica, NY 11434
Premises

1

The Lease Summary set forth below (the "Lease Summary") forms an integral part of this Lease, and all terms and other provisions of the Lease Summary have the respective meanings or amounts as stated and are hereby incorporated by reference into the Lease, except and to the extent more specifically set forth in the text of the Lease and its Exhibits, Schedules and Supplements.

A.  Date of Lease Execution:       December 5 2018

B.  "Landlord":                    Seagis JFK LLC

C.  "Landlord's Address":          One Tower Bridge
                                   100 Front Street – Suite 350
                                   West Conshohocken, PA 19428
                                   Attention: Charlie Lee

D.  "Tenant":                      SSP America, Inc.

E.  Intentionally Omitted.

F.  "Tenant's Address":            20408 Bashan Drive, Suite 300
                                   Ashburn, VA 20147

G.  "Building" :                   165-35 145th Drive, Jamaica, NY 11434

H.  "Premises"                     That certain 24,440 square foot portion of
                                   the Building as indicated on Exhibit A.

I.  Intentionally Omitted.

J.  "Tenant's Proportionate
    Share":                        100%

J.  "Intended Use" of
    Premises (Article 3):          General office use, cooking and food
                                   preparation, and storage of dry and wet
                                   foods, supplies for distribution and
                                   warehousing of associated items.

K.  Term of Lease (Section 1.3):   Fifteen (15) years and six (6) months.

                                   "Commencement Date": December 1, 2018

                                   "Operating Costs Commencement Date":
                                   June 1, 2019

"Rent Commencement Date": June 1, 2019

"Expiration Date": May 31, 2034.

L.    "Base Rent" (Section 2.1):

| Rental Period | Monthly Base Rent<br>(excluding Additional Rent, CAM or increased operating costs and sales tax) |
|---|---|
| December 1, 2018 – May 31, 2019 | $0.00 |
| June 1, 2019 – May 31, 2020 | $36,660.00 |
| June 1, 2020 – May 31, 2021 | $37,759.80 |
| June 1, 2021 – May 31, 2022 | $38,892.59 |
| June 1, 2022 – May 31, 2023 | $40,059.37 |
| June 1, 2023 – May 31, 2024 | $41,261.15 |
| June 1, 2024 – May 31, 2025 | $42,498.99 |
| June 1, 2025 – May 31, 2026 | $43,773.96 |
| June 1, 2026 – May 31, 2027 | $45,087.18 |
| June 1, 2027 – May 31, 2028 | $46,439.79 |
| June 1, 2028 – May 31, 2029 | $47,832.98 |
| June 1, 2029 - May 31, 2030 | $49,267.97 |
| June 1, 2030 – May 31, 2031 | $50,746.01 |
| June 1, 2031 – May 31, 2032 | $52,268.39 |
| June 1, 2032 - May 31, 2033 | $53,836.45 |
| June 1, 2033 – May 31, 2034 | $55,451.54 |

M.    Security Deposit (Section 2.7):    $75,000.00
(due upon execution of Lease)

N.    Cost Pass-Throughs (Section 2.3):    Operating Costs

O.    Intentionally Omitted.

P.    Intentionally Omitted.

Q.    Commercial General
Liability Insurance (Article 5)    $5,000,000.00 general aggregate

R.    Broker(s) (Section 19.14):    NAI Long Island

Each party agrees to indemnify the other party for any and all brokerage commission(s) or finder's fee(s) (and all attorney's fees and costs of any kind relating to any dispute, litigation proceeding, or matters connected to such brokerage commission(s) or finder's fee(s) asserted by

a person, firm or corporation other than NAI Long Island (the "Broker") claiming to have been engaged by the indemnifying party. Landlord agrees to pay the Broker a brokerage commission upon execution of this Lease in accordance with its agreement with the Broker.

S.     "Parking Area":

Exclusive use of one half of the parking lot on the west side of the Premises (which includes approximately 10 parking spaces), plus exclusive use of the fenced yard area and truck court on the east side of the Building, as indicated on Exhibit A-1.

T.     Rules and Regulations:

The rules and regulations established by Landlord concerning the use of the Building and the Common Areas as well as the general conduct of operations by tenants of the Property, as the same may be modified by Landlord from time to time. A current copy of the Rules and Regulations are attached hereto as Exhibit C.

# LEASE

THIS LEASE (this "Lease," which term shall include all amendments, modifications and assignments hereof) is dated as of the 5th day of December, 2018 (the "Effective Date"), by and between SEAGIS JFK LLC, a Delaware limited liability company ("Landlord"), and SSP AMERICA, INC., a California corporation ("Tenant").

## ARTICLE 1
## GRANT AND TERM

1.1     Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, the "Premises" (as specified in the Lease Summary), together with the right to the use, in common with other tenants and Landlord, of the Common Areas (as herein defined), as expressly set forth herein.  The Premises is located in a development located in Queens County, New York, as such development may be added to or reduced from time-to-time (the "Development").  The Development may include common parking areas, streets, sidewalks, driveways, storm drainage facilities and landscaped areas (the "Common Areas").

1.2     Prior to the Commencement Date, Landlord shall complete all work described on Exhibit B attached hereto (the "Improvements").  Except for the Improvements and Landlord's maintenance obligations set forth herein, Landlord shall have no construction or similar obligations.

1.3     The term hereof (the "Term") is anticipated to commence on the Commencement Date and shall terminate on the Expiration Date (unless the Term shall be terminated or extended in accordance herewith). If Landlord fails to deliver possession of the Premises to Tenant on or prior to the scheduled Commencement Date, this Lease shall not be void or voidable nor shall Landlord be liable to Tenant for any loss or damage (whether direct, consequential or otherwise), and in such case the Commencement Date shall be the date upon which Landlord delivers the Premises to Tenant with the Improvements substantially completed, and all subsequent dates shall likewise be extended.  All of the dates and time periods set forth in this Section 1.3 and pertaining to Landlord's obligations shall be extended by a period of time equal to any delay in delivery of the Premises caused by: (a) Tenant; or (b) any act of God, labor dispute, materials shortage, or other circumstance beyond Landlord's control.  This Section 1.3 shall be deemed to be an express provision to the contrary of §223-a of the Real Property Law of the State of New York and any other law of like import now or hereafter in force.  The first "Lease Year" shall begin on the Commencement Date and shall extend through the last day of the twelfth (12th) full calendar month after the Commencement Date.  Thereafter, each "Lease Year" shall commence on the day following the expiration of the preceding Lease Year and shall end at the expiration of twelve (12) calendar months thereafter; provided, however, that the last "Lease Year" shall end on the Expiration Date.

1.4     Parking.  Subject to the terms and conditions of this Lease and Landlord's reasonable rules and regulations related thereto, Tenant and the Tenant's agents, employees, representatives, contractors, subcontractors and invitees (collectively, the "Tenant Parties"), shall be entitled to use, on an exclusive basis, the Parking Area.  Neither Tenant nor the Tenant Parties shall with their vehicles block parking areas or hinder normal traffic flow within the Development.  Landlord reserves the right to reasonably control the method and manner of parking; provided, however, that in no event shall Landlord have the right to prohibit or limit the use of specific parking spaces or areas, or to relocate Tenant's reserved spaces. Landlord shall not be responsible for policing such parking or enforcing Tenant's rights hereunder.  Notwithstanding the foregoing, upon Tenant's request, Landlord shall use reasonable efforts to enforce Tenant's parking rights hereunder.  Landlord shall be responsible for all repair and maintenance of the Parking Area; provided however, if any such work is required as a result of the negligence or misconduct of Tenant or any Tenant Parties or the misuse of the Premises or the parking areas by Tenant or the Tenant Parties, Tenant shall reimburse Landlord for all costs incurred by Landlord for such work upon demand as Additional Rent.

# ARTICLE 2
# RENT

2.1     Tenant shall pay to Landlord all sums due hereunder from time to time from the Commencement Date without any prior demand, except as may be specifically provided in this Lease, however payments other than Tenant's regular monthly payments of Base Rent and "Operating Costs" (subsequently defined), shall be payable by Tenant to Landlord within ten (10) days following demand, except as otherwise provided in this Lease.  All other charges other than Base Rent that are required to be paid by Tenant to Landlord under this Lease shall constitute Additional Rent.  Base Rent and Additional Rent (Base Rent and Additional Rent are collectively referred to as "Rent"), for any "Lease Year" consisting of more than twelve (12) months shall be prorated on a per diem basis, based upon a period of 365 days.  Rent payable for any partial month shall be prorated on a per diem basis, based upon a thirty (30) day month.  Tenant agrees that its covenant to pay Rent and all other sums under this Lease is an independent covenant and that all such amounts are payable without counterclaim, set-off, deduction, abatement, or reduction whatsoever, except as may be expressly provided for in this Lease.  In the event of non-payment of Additional Rent, Landlord shall have the same rights and remedies provided in this Lease, at law or in equity, for non-payment of Base Rent.

2.2     Subject to any escalation which may be provided for in this Lease, Tenant shall pay Base Rent for the Term in the initial amount specified in the Lease Summary, which, except for the first installment (which shall be payable on or before the Effective Date and shall be applied to Tenant's first month of Base Rent due on the Rent Commencement Date), shall be payable throughout the Term in equal monthly installments in advance on the first day of each calendar month of each year of the Term, such monthly installments to be in the amounts (subject to escalation) specified in the Lease Summary.  Landlord and Tenant acknowledge that, prior to the Effective Date, Tenant has deposited $2,000 with Landlord and that such deposit shall be applied toward Tenant's first month of Base Rent. The obligation of Tenant to pay Base Rent shall commence on the Rent Commencement Date.  The Base Rent described above shall be adjusted on the first anniversary of the Rent Commencement Date and on each succeeding anniversary of the Rent Commencement Date during the Term of this Lease as provided in the Lease Summary.

2.3     In addition to the Base Rent specified in this Lease, Tenant shall pay to Landlord as Additional Rent for the Premises Tenant's Proportionate Share of "Operating Costs" (as subsequently defined).  Tenant's obligation to pay its proportionate share of Operating Costs shall commence as of the Operating Costs Commencement Date.  The amount of Operating Costs payable to Landlord by Tenant may be estimated by Landlord for such period(s) as Landlord may determine from time to time (not to exceed twelve (12) months), and Tenant shall pay to Landlord the amounts so estimated in equal installments, in advance, on the first day of each month during such period.  Within a reasonable period of time after the end of the period for which estimated payments have been made, Landlord shall furnish to Tenant a statement, showing the actual amount payable by Tenant based upon actual costs.  If such actual Operating Costs for such calendar year shall exceed Tenant's payment so made, Tenant shall pay to Landlord the deficiency within fifteen (15) days after receipt of said statement. If Tenant's payments shall exceed such actual Operating Costs, as shown on such statement, such excess shall be applied against payments next becoming due under this Lease, or, if the Lease has expired, shall be promptly refunded to Tenant.  For purposes of this Lease, Operating Costs means any and all costs and expenses paid or incurred by or on behalf of Landlord in connection with the management, operation, maintenance and repair of the Building, including, without limitation:  (i) repair and maintenance of all grounds, gutters, alleys, curbs, parking areas or facilities, driveways, sidewalks, and lawncare; landscaping; service agreements and trash, snow and ice removal; provided, however, that in the event that any portion of the parking areas or facilities are used by other tenants or invitees, Tenant shall only be responsible for the portion of which serve the Premises; (ii) the cost of fire and extended coverage at full replacement value, boiler, sprinkler, apparatus, public liability, property damage, rent interruption for one year, earthquake and such other insurance as Landlord from time to time carries, together with the full amount of any deductible; (iii) all costs and fees for licenses, inspections or permits that Landlord or Tenant may be required to obtain in connection with the operation of the Building; (iv) reasonable fees, costs and disbursements incurred in connection with proceedings to contest, determine, or reduce Operating Costs, including, but not limited to, Taxes (as hereinafter defined), but only to the extent of any net savings to Tenant; and (v) Taxes.  Tenant shall also pay a property management fee to Landlord (or to an affiliate or agent of Landlord) as Additional Rent in an amount equal to 2.0% of the combined total of Base Rent and Additional Rent due to Landlord hereunder. For purposes of this provision, Operating Costs shall exclude all of the following: (i) principal, interest or other debt service payments; (ii) payments in the nature of rent under any ground lease or similar agreement; (iii)

penalties, interest, damages, costs, or fees incurred as a result of Landlord's negligence or the violation of any laws; (iv) incremental costs incurred by Landlord to the extent due to violation by Landlord of the terms and conditions of this Lease; and (v) costs incurred by Landlord performing its obligations set forth in <u>Section 1.2</u>, <u>Section 7.1</u> and <u>Section 8.1</u>.

2.4     Rent shall be paid to or upon the order of Landlord by ACH transfer or such other method as Landlord agrees, in its sole discretion; provided Landlord shall deliver at least ten (10) business days' notice to Tenant of any change in payment method. No payment by Tenant or receipt by Landlord of an amount less than the Rent due hereunder shall be deemed to be other than on account of the earliest stipulated Rent due hereunder.

2.5     Any Base Rent or Additional Rent payable by Tenant to Landlord under this Lease which is not paid within ten (10) days after the same is due, will be subject to (i) a late payment charge, as Additional Rent, of five percent (5%) of the delinquent amount, in each instance, to cover Landlord's additional administrative costs and (ii) if any payment shall remain overdue for more than fifteen (15) days, interest on all such unpaid sums (other than the late charge), at a per annum rate equal to the lesser of the highest rate permitted by law or eighteen percent (18%). The rate of interest determined pursuant to the preceding sentence is sometimes hereinafter referred to as the "Maximum Interest Rate." Such late charges and interest will be due and payable upon demand and will accrue from the date that such Base Rent, Additional Rent, late charges or other sums are payable under the provisions of this Lease until actually paid by Tenant. Such late charges and interest shall not be considered the granting of a grace period.

2.6     If at any time during the Term of this Lease, any requirement of public authority shall have the effect of limiting, for any period of time, the amount of the rents payable by Tenant, or receivable by Landlord, under this Lease, and the maximum Rents so permitted to be paid by Tenant, or received by Landlord, hereunder shall be less than the Rents herein reserved, then (i) throughout the period of limitation, Tenant shall remain liable for the maximum amount of rents that is lawfully payable; and (ii) if and when the period of limitation ends, the requirement of public authority imposing such limitation is repealed, or such limitation is restrained or rendered unenforceable by any order or ruling of a court of appropriate jurisdiction to the extent that the same is not prohibited by any requirement of public authority, Tenant shall pay to Landlord, on demand, all amounts that would have been due from Tenant to Landlord during the period of limitation, but that were not paid because of the requirements of public authorities; and thereafter, Tenant shall pay to Landlord all of the Rents reserved under this Lease, all of which shall be calculated as if there had been no intervening period of limitation.

2.7     Landlord acknowledges receipt of a security deposit in the amount specified on the Lease Summary to be held by Landlord, as security for the performance by Tenant of all its obligations under this Lease. If Tenant defaults in any of its obligations under this Lease, Landlord may at its option, but without prejudice to any other rights which Landlord may have, apply all or part of the security deposit to compensate Landlord for any loss, damage, or expense sustained by Landlord as a result of such default (including sales taxes). If all or any part of the security deposit is so applied, Tenant shall restore the security deposit to its original amount on demand of Landlord. Subject to the provisions of this <u>Section 2.7</u>, within thirty (30) days following termination of this Lease, if Tenant is not then in default or if no default would occur after a lapse of time, the security deposit will be returned by Landlord to Tenant.

2.8     In lieu of depositing the Security Deposit with Landlord in cash, Tenant shall have the right to deliver the Security Deposit to Landlord in the form of an irrevocable, standby letter of credit ("L/C") issued by a national U.S. banking institution reasonably acceptable to Landlord who is fully insured by the Federal Deposit Insurance Corporation ("L/C Issuer") and in the form attached as <u>Exhibit D</u> hereto or another commercially reasonable form prescribed by Tenant's bank. In addition to any other items that Landlord may reasonably require the L/C shall: (a) name Landlord as its beneficiary; (b) have an initial term of no less than one year; (c) renew for one year periods unless the issuer provides Landlord with at least 60 days' advance written notice that the L/C will not be renewed; (d) permit partial draws; (e) provide that the sole and exclusive condition to any draw on the L/C shall be that Landlord certifies to the issuer that either or both of the following is/are true: (i) Tenant is the debtor in a pending bankruptcy proceeding; or (ii) an event of default by Tenant has occurred under this Lease beyond applicable notice and cure periods; and (f) be transferable to successor landlords, including, successors by foreclosure or deed in lieu of foreclosure, on as many occasions as desired upon payment of a normal and customary fee chargeable to Tenant and not Landlord. Notwithstanding the foregoing, in the event that: (x) the expiration date

of any L/C occurs before the expiration date of this Lease, (y) the issuer has advised Landlord that the issuer will not automatically renew the L/C; and (z) Tenant fails to deliver to Landlord at least forty-five (45) days prior to the expiration of such L/C either (A) an amendment thereto extending the expiration date of such L/C for not less than twelve (12) months, (B) a new L/C, in form and substance in accordance with (a) through (f) above and otherwise satisfactory to Landlord (in its reasonable discretion), or (C) a cash Security Deposit in place of the L/C, then Landlord may draw on such L/C and apply the proceeds to the liabilities of Tenant hereunder, in addition to any other remedies available to Landlord under this Lease) hold such proceeds as a cash Security Deposit pursuant to Section 2.7 above. If an event of default occurs hereunder on the part of Tenant beyond applicable notice and cure periods, Landlord may, without notice to Tenant, draw on the L/C and apply the proceeds to the liabilities of Tenant hereunder, in addition to any and all other remedies available to Landlord under this Lease. If at any time the L/C Issuer's financial condition changes in any materially adverse way, as determined by the Landlord in its sole discretion, the Tenant should deliver within five days written notice from the Landlord a replacement L/C which meets the requirements of this Lease. Failure to deliver a replacement L/C shall constitute an event of default by the Tenant. In the event Landlord draws against the L/C, Tenant shall, upon demand, at Tenant's option, immediately either (aa) deposit with Landlord a sum equal to amount drawn under the L/C or (bb) deliver to Landlord an additional L/C in an amount equal to the amount drawn. If Tenant fully and faithfully complies with all the covenants hereunder, the L/C (or any balance thereof), together with Landlord's written consent to the cancellation of any and all outstanding L/Cs constituting part of the Security Deposit, shall be delivered to Tenant within thirty (30) days after the last to occur of (1) the date the Term expires or terminates or (2) delivery to Landlord of possession of the Property. Landlord may assign the L/C to any purchaser of Landlord's interest in the Property or any successor landlord, if applicable, whereupon Landlord shall be discharged from any further liability with respect to the L/C. In the event that Landlord exercises its right under the preceding sentence, Tenant shall fully cooperate with Landlord, in all reasonable respects, to cause the L/C to be assigned and conveyed to, or reissued to, such purchaser or successor landlord, as the case may be, and Tenant shall bear any expenses incurred in connection therewith.

2.9     Landlord hereby expressly waives any and all liens against Tenant's property in connection with this Lease, whether at common law or by statute, by distress, distraint or otherwise. At Tenant's request, Landlord shall execute, within ten (10) days of such request, any reasonable document confirming such waiver.

### ARTICLE 3
### USE

Tenant intends to use the Premises solely for general office use, food preparation and storage of dry and wet foods, supplies for distribution and warehousing of associated items (the "Intended Use"). Tenant's use of the Premises shall comply with all zoning and building requirements. Tenant shall not use or permit the Premises to be used for any unlawful purpose. Tenant's use of the Premises shall at all times be consistent with uses typical of a commercial/industrial park, as such standards exist from time to time, in the Greater New York City metropolitan area. Tenant acknowledges that the specification of an "Intended Use" means only that Landlord has no objection to the specified use and does not include any representation or warranty by Landlord as to whether or not such specified use complies with applicable Laws and/or requires special governmental permits.

### ARTICLE 4
### TAXES

4.1     "Taxes" shall mean a sum equal to the aggregate of:  (i) the product determined by multiplying (a) the then applicable full New York City real estate tax rate in effect with respect to the Borough of Queens by (b) the then applicable assessed valuation of the Building and the land on which the Building is located (collectively, the "Real Property") and the Common Areas, plus (ii) amounts assessed by any business improvement district in which the Real Property is located, plus (iii) any other assessments, special or otherwise (including any kind whatsoever attributable to the so-called JFK Improvement District (IBID)), upon or with respect to the Real Property or the Common Areas, or both, imposed by the City of New York or any other taxing authority, assessments (general or special), any other ad valorem taxes, sewer rents, rates and charges, and any other federal, state or local governmental charge, general, special, ordinary or extraordinary (but not including income or franchise taxes or any other taxes imposed upon or measured by Landlord's income or profits, except as provided herein), which may now or hereafter be levied, assessed or imposed against, or with respect or attributable to the Real Property or the Common Areas, or both. If due to any change in the method of taxation, any franchise, income, profit, sales, rental,

4

use and occupancy or any other tax or payments in lieu of or in addition to any such Taxes shall be levied against Landlord or any owner of the Real Property, Building, Premises or Common Areas, including, without limitation, (i) a tax, assessment, levy, imposition or charge wholly or partially as capital levy or otherwise on the rents received therefrom, or (ii) a tax, assessment, levy, imposition or charge measured by or based in whole or in part upon the Real Property, Building, Premises or Common Areas and imposed upon Landlord, or (iii) a license fee measured by the rents payable by Tenant to Landlord, such taxes or payments shall be included in the term Taxes for the purposes of this Lease. "Taxes" shall include any reasonable amounts, charges, or legal fees incurred by Landlord to contest or dispute Taxes. Notwithstanding the year for which any such taxes or assessments are levied, in the case of special taxes or assessments which may be payable in installments, the amount of each installment, plus any interest payable thereon, payable during any year shall be considered Taxes assessed and levied for that year. Except as provided in the preceding sentence, all references to Taxes assessed, levied, confirmed or imposed during a particular year or Taxes "for" a particular year shall be deemed to refer to Taxes levied, assessed or otherwise imposed during such year without regard to when such Taxes are payable.

4.2    Tenant shall have the right to contest the amount or validity, in whole or in part, of any real estate Tax by appropriate proceedings diligently conducted in good faith, provided: (i) neither Landlord nor Tenant would by reason thereof be subject to any criminal liability (or any civil liability other than late charges, interest, fees and penalties attributable thereto which shall be Tenant's responsibility); (ii) neither the Premises nor any part thereof or interest therein would, by reason of the postponement or deferment of payment of such Tax, be, in the reasonable judgment of Landlord, in danger of being forfeited or lost or subject to any lien, encumbrance or charge or penalty unless Landlord is indemnified therefor by Tenant; and (iii) Tenant shall regularly keep Landlord advised as to the status of such proceedings. Upon the termination of such proceedings, it shall be the obligation of Tenant to pay the amount of such Tax or part thereof as finally determined in such proceedings to be due, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including reasonable attorneys' fees and disbursements), interest, penalties and other liabilities in connection therewith.

4.3    At Tenant's sole cost and expense, upon Tenant's written request, Landlord shall permit the proceedings to be brought in Landlord's name or shall join in any proceedings referred to in <u>Section 4.2</u> hereof if the provisions of any law, rule or regulation at the time in effect shall require that such proceedings be brought by and/or in the name of Landlord. If the preceding sentence applies, Landlord shall cooperate in such proceedings. If a refund of an overpayment of any real estate Tax paid by Tenant with respect to a period of time within the Term is paid (or credited) to Landlord, whether during the Term or after the expiration of the Lease, Landlord will pay such amount to Tenant within ten (10) business days after receipt thereof. If a refund of an overpayment of any real estate Tax paid by Landlord with respect to a period of time other than during the Term is paid to Tenant, whether during the Term or after the expiration of the Lease, Tenant will pay such amount to Landlord within ten (10) business days after receipt thereof.

## ARTICLE 5
## INSURANCE

5.1    Tenant shall procure and maintain policies of insurance, at its own cost and expense, insuring:

5.1.1    Tenant shall secure the following commercial general liability insurance coverage (ISO Form 0001 or equivalent) naming Landlord, Landlord's managing agent (if any), Landlord's mortgagee and the land thereunder (such mortgagee being hereinafter referred to as the "Mortgagee"), if required, and any other parties designated by Landlord as additional insureds. Such insurance shall be primary/non-contributing and not apply as excess to any other insurance secured by or available to Landlord or any Mortgagee.

5.1.1.1    At a minimum, Commercial General Liability of: (i) $2,000,000 per occurrence; (ii) $5,000,000 General Aggregate - Per Location Basis (which general aggregate limit may be satisfied by an umbrella liability policy); (iii) including Contractual Liability; (iv) $100,000 Damage to Rented Premise; statutory worker's compensation insurance, and employer's liability insurance with a Five Hundred Thousand Dollar ($500,000) minimum limit covering all of Tenant's employees. Such liability insurance shall include, without limitation, products and completed operations liability insurance, fire and legal liability insurance, and such other coverage as Landlord may reasonably require from time to time. At Landlord's request Tenant shall increase such insurance coverage to a level that is commercially reasonably required by Landlord.

5.1.2    Tenant's improvements (leasehold and otherwise) at any time situated upon the Premises against loss or damage by fire, explosion, windstorm, malicious mischief, vandalism, and all other insurable casualties insured under the ISO Special Form coverage, as such term is known on the date of this Lease, for not less than one hundred percent (100%) of the full replacement cost of such improvements, excluding foundations, as reasonably determined by Landlord.  Tenant shall also procure and maintain boiler and machinery coverage, if applicable.

5.1.4    All personal property of Tenant or the personal property of others (including, for the purposes of clarity, the specialized equipment contained in the Premises), on a replacement cost basis, kept, stored or maintained on the Premises against loss or damage by fire, windstorm or other casualties.

5.1.5    Such other matters as Landlord may reasonably require from time to time.  All insurance required to be provided shall include a standard New York mortgagee endorsement (without contribution), to the extent applicable.

5.2    All policies referred to above shall: (i) be taken out with insurers authorized to do business in the state of New York and reasonably acceptable to Landlord; (ii) be in a form reasonably satisfactory to Landlord; (iii) be non-contributing with, and shall apply only as primary and not as excess to any other insurance available to Landlord or any Mortgagee; (iv)  name Landlord and any other parties designated by Landlord as additional insureds, and (v) with respect to Section 5.1.2, contain replacement cost, demolition cost, and increased cost of construction coverage.  ACORD Standard Certificates of Insurance (ACORD 25 with respect to the Commercial General Liability insurance) shall be delivered to the Landlord, and Mortgagee if required, promptly upon request or, if required by a Mortgagee, copies of such insurance policies certified by an authorized officer of Tenant's insurer as being complete and current, shall be delivered to the Landlord promptly upon request. Tenant shall notify Landlord by certified mail not less than thirty (30) days prior to any material change, cancellation, or termination;  If (a) Tenant fails to take out or to keep in force any insurance referred to in this Article 5, or should any such insurance not be approved by either Landlord or any Mortgagee, and (b) Tenant does not commence and continue to diligently cure such default within five (5) days after written notice by Landlord to Tenant specifying the nature of such default, then Landlord shall have the right, without assuming any obligation in connection therewith, to effect such insurance at the sole cost of Tenant and all outlays by Landlord shall be paid by Tenant to Landlord without prejudice to any other rights or remedies of Landlord under this Lease.  Tenant shall not keep or use on the Premises any article which may be prohibited by any property or liability insurance policy in force from time to time covering the Premises or the improvements.

5.3    Except as otherwise provided herein, whenever (a) any loss, cost, damage or expense resulting from fire, explosion or any other casualty or occurrence is incurred by either of the parties hereto, or anyone claiming by, through, or under it in connection with the Premises, and (b) such party then is covered in whole or in part by insurance with respect to such loss, cost, damage or expense or is required under this Lease to be so insured, then the party so insured (or so required to be insured) hereby waives any claims against and releases the other party from any liability said other party may have on account of such loss, cost, damage or expense to the extent of any amount recovered by reason of such insurance (or which could have been recovered had such insurance been carried as so required).  The parties agree to furnish to each insurance company which has issued or will issue policies of casualty insurance on the improvements, written notice of said waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge such subrogation waivers.

5.4    Landlord shall throughout the Term carry (i) insurance on the Building and the machinery and equipment contained therein or servicing the Building and owned by Landlord (excluding any property with respect to which Tenant and other tenants are obliged to insure pursuant to Section 5.1 or similar section of their respective leases); (ii) commercial general liability insurance with respect to Landlord's operations in the Building; and (iii) such other forms of insurance as Landlord or its Mortgagee in their sole and absolute discretion consider advisable (the items in (i)-(iii), collectively, "Landlord's Insurance").

5.5    Notwithstanding anything to the contrary contained herein, commencing on the Operating Costs Commencement Date, Tenant shall be required to pay to Landlord, as Additional Rent, Tenant's Proportionate Share of the costs incurred by Landlord in connection with Landlord's Insurance (including the premiums therefor, but excluding any deductibles relating thereto) ("Insurance Amount"). The Insurance Amount shall be due and payable

from Tenant to Landlord, as Additional Rent, at Landlord's election (a) within ten (10) days after Landlord furnishes to Tenant an invoice therefor, or (b) at the times and in the manner set forth in Section 2.3 above. Notwithstanding anything to the contrary contained herein, Tenant shall pay to Landlord, as Additional Rent, (x) all deductibles payable with respect to Landlord's Insurance to the extent the same relate to the Premises, and (y) the cost of all FDNY permits for the HVAC equipment serving the Premises. Such amounts shall be due and payable within ten (10) days after Landlord furnishes to Tenant an invoice therefor. Tenant's obligation to pay all amounts set forth in this Article 5 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 6
## UTILITIES

Beginning on the Commencement Date, Tenant will pay, when due, all separately metered or billed charges of every nature, kind or description for utilities consumed by Tenant at the Premises, including all charges for water, sewerage, heat, gas, light, garbage, electricity, telephone, steam, power or other public or private utility services. In the event that any utilities are not separately metered or billed, Tenant agrees to pay Tenant's Proportionate Share of all utilities for the Building as part of Additional Rent.

## ARTICLE 7
## MAINTENANCE AND ALTERATIONS

7.1    Throughout the Term, Landlord agrees to keep the following in good repair and working order as a prudent owner: (i) the structure of the Building, including, without limitation, exterior walls, slab and roof of the building (at Landlord's sole cost and expense); and (ii) the entrances, sidewalks, corridors, parking areas and other Common Areas solely servicing the Building (which costs shall be passed along to Tenant as Operating Costs). Notwithstanding the foregoing provisions of this Section 7.1 or Article 5, if any part of the Building is destroyed, damaged, suffers a casualty, or requires repair as the result of any act or omission of Tenant, its agents, invitees, licensees, contractors, or employees, Landlord shall be entitled to repair or replace same and the reasonable cost of any such repairs or replacements shall be paid to Landlord by Tenant upon demand by Landlord. If, in any emergency, it shall become necessary to make promptly any repairs or replacements required to be made by Tenant, Landlord may re-enter the Premises and proceed forthwith to have the repairs or replacements made and pay the costs thereof. Upon demand, Tenant shall reimburse Landlord for the reasonable cost of making the repairs. Tenant shall otherwise, at its sole cost, repair and maintain the Premises including, but not limited to, base building mechanical and electrical systems to the extent the same are contained in or serve the Premises and are located on the parcel of real property on which the Building sits, all to a standard consistent with a first class commercial/industrial building, with the exception only of those repairs which are the obligation of Landlord pursuant to this Lease. Without limiting the generality of the foregoing, Tenant is specifically required to maintain, make repairs to and replace (to the extent a reputable third-party vendor recommends replacement in lieu of repair) (i) the interior of the Premises; (ii) the utility, electrical, heating, mechanical, sanitary, sprinkler, plumbing, cleaning, fire prevention systems or life safety systems in the Premises and other mechanical systems and equipment and conduits ("Building Systems") exclusively serving the Premises; (iii) the loading docks appurtenant to the Premises and the portions of the pavement and paving areas adjacent to the loading docks for the Premises which repair or maintenance is necessary due to damage to the asphalt or pavement caused by the parking of trailers or otherwise due to Tenant's operations at its loading docks; (iv) windows, plate glass, doors, and any fixtures or appurtenances composed of glass; (v) Tenant's sign; (vi) any heating or air conditioning equipment serving the Premises ("HVAC") (which shall include, without limitation, a preventive maintenance HVAC service contract, which service contract shall be entered into between Tenant and one of Landlord's approved HVAC contractors and such service contract shall include, without limitation, preventive HVAC maintenance no less than quarterly); and (vii) the Premises or the Building when repairs to the same are necessitated by any act or omission of Tenant, or the failure of Tenant to perform its obligations under this Lease. Notwithstanding the foregoing, if during the last year of the Term, a reputable third-party vendor recommends replacement of a Building System (other than any specialized equipment) and Tenant has properly maintained such Building System during the Term, then such replacement shall be at Landlord's sole cost and expense. All repair and maintenance performed by Tenant in the Premises shall be performed by contractors or workmen designated or approved by Landlord. At the expiration or earlier termination of the Term, Tenant shall surrender the Premises to Landlord in as good condition and repair as Tenant is required to maintain the Premises throughout the Term, subject to reasonable wear and tear and damage from casualty and condemnation excepted. Tenant shall also furnish, maintain, and replace all electric light bulbs,

tubes, and tube casings located within or serving the Premises and Tenant's signage, all at Tenant's sole cost and expense. Notwithstanding anything contained herein to the contrary, if, during the Term, (a) a reputable third-party vendor recommends the replacement of the HVAC unit specific to the 2nd floor office (in lieu of repair), (b) such replacement is not necessitated due to the negligence or willful misconduct of Tenant, and (c) Tenant has maintained the afore-mentioned preventative maintenance HVAC service contract during the Term, then such replacement shall be at Landlord's cost and expense; provided, however, that Landlord may include as an Operating Cost, the cost of such replacement amortized over its useful life in accordance with generally accepted accounting principles consistently applied, together with interest on the unamortized balance at the rate of nine percent (9%) per annum.

7.2     Tenant will not make any alterations, additions, or improvements to the Premises without the prior written consent of Landlord and, if required by the terms of any mortgage, deed of trust, security instrument or other document of like nature (hereinafter referred to as a "Mortgage") on the Premises, without the prior written consent of the Mortgagee; provided, however, that Tenant may make interior, non-structural alterations not exceeding $100,000 in the aggregate, without the prior written consent of Landlord or Mortgagee, provided that Tenant provides Landlord with prior written notice of any such alterations. Landlord shall have the right to request the plans and specifications for such alterations that are non-cosmetic in nature, which Tenant shall promptly provide upon such request. Tenant shall obtain all required building permits and other necessary governmental approvals. Landlord reserves the right to withhold its consent in its sole and absolute discretion with respect to any alterations, additions or improvements which are exterior or structural in nature or which affect the Building Systems. In any event, both the contractors used and the plans and specifications for the alterations, additions, or improvements shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld or delayed or conditioned upon payment or consideration (except such payment or consideration as is required to be paid or made to Landlord under this Lease). All alterations, additions, or improvements made by either of the parties hereto on the Premises will be property of Landlord and will remain on and be surrendered with the Premises at the termination of this Lease, except that Landlord may require alterations or improvements made by Tenant to be removed and the Premises restored by Tenant at Tenant's sole cost and expense to the condition thereof as the commencement of this Lease.

7.2.1     All fixtures and equipment paid for by Landlord and all fixtures and equipment which may be paid for and placed on the Premises by Tenant from time to time but which are so incorporated and affixed to the Premises that their removal would involve damage or structural change to the Premises or which fixtures have become essential to the operation of the Premises and its systems, will be and remain the property of Landlord. Landlord reserves the right at any time, however, to require Tenant to remove such fixtures and equipment at Tenant's sole cost and expense, and to restore the Premises as required by Article 7 and Article 19 hereof.

7.2.2     All furnishings, equipment, and fixtures other than those specified in this Article, which are paid for and placed on the Premises by Tenant from time to time (other than those which are replacements for fixtures originally paid for by Landlord) will remain the property of Tenant, but their removal will be at Tenant's expense and such removal will be in compliance with Article 7 and Article 17 hereof.

**ARTICLE 8**
**COMPLIANCE WITH LAWS AND ORDINANCES**

8.1     Except with respect to matters arising prior to the Commencement Date, and except as to matters which are expressly stated to be Landlord's responsibility hereunder, Tenant shall, at its sole cost and expense throughout the Term, comply with, or cause compliance with, or remove or cure any violation of, any and all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and other governmental bodies having jurisdiction over the Premises, including, without limitation, the Americans with Disabilities Act as such laws, ordinances, etc. exist as of the Effective Date and as the same may hereinafter be amended or supplemented, and whether or not such compliance is related to Tenant's specific use of the Premises. Notwithstanding the foregoing, Landlord agrees that if Landlord receives a written notice from a governmental authority ("Citation") notifying Landlord that the Premises are not in compliance with any laws, and such non-compliance existed as of the Commencement Date (regardless of when such Citation is actually received by Landlord), Landlord shall cause any repairs, replacements or improvements to be made to the Premises, so as to remedy the matter set forth in the Citation ("Citation Remedy"). The costs and expenses incurred by Landlord to perform any Citation Remedy pursuant to the preceding sentence shall be (x) the sole responsibility of Tenant if the

matter set forth in the Citation is as a result of (1) Tenant's (or any assignee's or subtenant's) particular use of the Premises (as opposed to warehouse, distribution, or office use in general); (2) any Tenant Necessitated Repairs (as hereinafter defined); or (3) alterations or improvements performed by or at the request of Tenant (excluding the Improvements) (items (1) through (3) collectively, "Tenant Repair Items"), in which event Tenant shall reimburse Landlord for such costs within ten (10) days after delivery of written invoices therefor; or (y) the sole responsibility of Landlord except as otherwise set forth in clause (x) above. If Landlord receives a Citation notifying Landlord that the Premises are not in compliance with any laws, and such non-compliance did not exist as of the Commencement Date (regardless of when such Citation is actually received by Landlord), (A) Tenant shall perform the Citation Remedy at its sole cost and expense if such Citation Remedy is any of the Tenant Repair Items, or (B) Landlord shall perform the Citation Remedy if such Citation Remedy is not any of the Tenant Repair Items, provided that any costs or expenses incurred by Landlord to perform any work pursuant to this sentence shall be deemed a component of Operating Costs. Notwithstanding anything herein to the contrary, before performing any Citation Remedy required hereunder, Landlord shall have the right to appeal or dispute such Citation so long as such appeal or dispute does not unreasonably affect Tenant's ability to operate in the Premises. For purposes herein, a "Tenant Necessitated Repair" shall mean any work, maintenance, repairs or replacements that are required as a result of the negligence or misconduct of Tenant or any of the Tenant Parties, or Tenant's failure to repair and maintain the Premises or the misuse of the Premises or the Building by Tenant or the Tenant Parties.

8.2     After prior written notice to Landlord, Tenant, at its sole cost and expense, shall have the right to contest the validity or application of any law or ordinance for which Tenant is responsible with complying under the terms of this Lease in the name of Tenant, or if required by law, in Landlord's name (but at Tenant's sole cost), or both, by appropriate legal proceedings diligently conducted, but may only withhold compliance therewith if, by the terms of any such law or ordinance, compliance therewith pending the prosecution of any such proceeding may legally be delayed without incurring any lien, surcharge or liability of any kind against the Premises, or any portion thereof, and without subjecting Landlord, any Mortgagee or Tenant to any liability, civil or criminal, or result in a default under any Mortgage affecting the Premises, for failure to so comply therewith until the final determination of such proceeding; provided, however, if any lien, charge or civil liability would be incurred by reason of any such delay, Tenant nevertheless, may contest as aforesaid and delay as aforesaid, provided that such delay would not subject Landlord, any Mortgagee or Tenant to criminal liability, or result in a default under any Mortgage affecting the Premises, and Tenant (a) prosecutes the contest with due diligence and in good faith; (b) agrees to indemnify, defend and hold harmless Landlord, each Mortgagee and the Real Property from any charge, liability or expense whatsoever, and (c) provides Landlord or such governmental body as may require the same, with adequate security in the form of a bond or otherwise to adequately protect Landlord, the Development and Landlord's interest in the Premises. If necessary or proper to permit Tenant to so contest the validity or application of any such law or ordinance, Landlord shall execute and deliver any appropriate papers or other documents; provided, however, Landlord shall not be required to execute any document or consent to any proceeding which would result in the imposition of any cost, charge, expense or penalty on Landlord or the Premises (with adequate security therefore), unless Tenant otherwise insures or indemnifies Landlord or the Premises (with adequate security therefor) against such cost, charge, expense or penalty.

## ARTICLE 9
## MECHANIC'S LIENS

The parties hereto expressly acknowledge and agree that the interest of Landlord in the Premises shall not be subject to liens for improvements made by Tenant, and Tenant shall so notify all contractors making any such improvements of such provision in this Lease. Tenant shall not suffer or permit any mechanic's lien or other lien to be filed against the Premises, or any portion thereof, by reason of work, labor, skill, services, equipment or materials supplied or claimed to have been supplied to the Premises at the request of Tenant, or of anyone holding the Premises, or any portion thereof, by, through or under Tenant. If any such mechanic's lien or other lien at the time shall be filed against the Premises or any portion thereof, Tenant, within ten (10) business days after the date Tenant first becomes aware of the filing of the same, shall cause said lien, at Tenant's election, either to be discharged of record or to be bonded over in a manner which is reasonably acceptable to Landlord. If Tenant shall fail to discharge such mechanic's lien or liens or other lien or to bond over the same within such period, then Landlord may, but shall not be obligated to, discharge the same by paying to the claimant the amount claimed to be due or by procuring the discharge of such lien as to the Premises by deposit of a cash sum or a bond or other security, or in such other manner as is now or may in the future be provided by present or future law for the discharge of such lien as a lien against the Premises. Any amount paid by Landlord, or the value of any deposit so made by Landlord,

together with all costs, fees and expenses in connection therewith (including reasonable attorneys' fees), together with interest thereon at the Maximum Interest Rate, shall be repaid by Tenant to Landlord within thirty (30) days after demand therefor. Tenant shall indemnify, defend and hold harmless Landlord and the Premises from all losses, costs, damages, expenses, liabilities, suits, penalties, claims, demands and obligations, including, without limitation, reasonable attorneys' fees, resulting from the assertion, filing, foreclosure or other legal proceedings with respect to any such mechanic's lien or other lien. **NOTICE IS HEREBY GIVEN THAT LANDLORD IS NOT AND SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIALS FURNISHED TO TENANT OR ANYONE HOLDING THE PREMISES, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT LANDLORD'S INTEREST IN THE PREMISES, THE REAL PROPERTY OR ANY PORTION OF THE DEVELOPMENT.**

**ARTICLE 10**
**DEFAULTS OF TENANT**

10.1     The occurrence of any one or more of the following events shall constitute an "Event of Default":

10.1.1     If default shall be made in the due and punctual payment of any Rent or in the payment of any other amount to be paid by Tenant to Landlord, when and as the same shall become due and payable, and such default shall continue for a period of within five (5) days after Tenant is given a notice specifying such default (which 5-day notice shall be deemed to satisfy any legal requirement for the statutory notice under New York State Real Property Actions and Proceedings Law §711(2) and any other law of like import now or hereafter in force).

10.1.2     If default shall be made by Tenant in keeping, observing or performing any of the terms contained in this Lease, other than as referred to in Section 10.1.1, and such default shall continue for a period of fifteen (15) days after written notice thereof given by Landlord to Tenant, or, provided that there shall be no risk of loss to the Building, the Premises or any interest of Landlord therein, such longer period (not to exceed sixty (60) days) as is reasonable to cure said default, with due diligence and in good faith.

10.1.3     The filing of a petition by Tenant for adjudication as a bankrupt or insolvent, or for its reorganization or for the appointment of a receiver or trustee of Tenant's property; the filing of a petition against Tenant for adjudication as a bankrupt or insolvent, or for its reorganization or for the appointment of a receiver or trustee of Tenant's property and the failure to discharge or dismiss such proceedings within sixty (60) days from its filing; an assignment by Tenant for the benefit of creditors; or the taking possession of the Premises or any other property of Tenant by any governmental office or agency pursuant to statutory authority for the dissolution or liquidation of Tenant.

10.1.4     If any event shall occur or any contingency shall arise whereby this Lease or the estate hereby granted or the unexpired balance of the Term would, by operation of law or otherwise, devolve upon or pass to any person other than Tenant, except as expressly permitted by the provisions of this Lease.

10.1.5     If Tenant shall vacate or abandon the Premises (unless as a result of a casualty or the performance of alterations) for a period longer than seven (7) calendar days.

10.2     To the extent permitted by applicable law, this Lease and the Term and estate hereby granted are subject to the limitation that whenever an Event of Default occurs, Landlord shall have the rights and remedies hereinafter set forth, which shall be distinct, separate and cumulative, including without limitation:

10.2.1     Landlord may give Tenant a notice to end the Term at the expiration of five (5) days from the date of service of such notice, and upon the expiration of said five (5) day period this Lease and the Term and estate hereby granted, whether or not the Term shall theretofore have commenced, shall terminate with the same effect as if that day were the date originally fixed for the expiration of the Term, but Tenant will remain liable for all Rent and other charges due hereunder through the date of such termination and all damages resulting from Tenant's default.

10.2.2    Landlord may terminate Tenant's right to possess the Premises whether or not this Lease is terminated and Landlord or Landlord's agents and employees may immediately or at any time thereafter re-enter the Premises, or any part thereof, either by summary dispossess proceedings or by any suitable action or proceeding at law, or otherwise as permitted by law, without being liable to indictment, prosecution or damages therefor, and may repossess the Premises (or part thereof), and may remove any persons and property therefrom, and may dispose of such property as Landlord sees fit without liability to Tenant or otherwise.  The word re-enter, as herein used, is not restricted to its technical legal meaning.

10.2.3    Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, and for the enforcement of any other appropriate legal or equitable remedy, including, without limitation, injunctive relief, and for recovery of all monies due or to become due from Tenant under any provision of this Lease.  In the event of a breach or threatened breach by Tenant of any of its obligations under this Lease, Landlord shall also have the right of injunction.  The remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other remedies or means of redress to which Landlord may lawfully be entitled at any time and Landlord may invoke any remedy allowed at law or in equity as if specific remedies were not provided for herein.

10.2.4    Landlord may (but shall not be obligated) to remedy or attempt to remedy any default of Tenant under this Lease for the account of Tenant and may enter upon the Premises for such purposes.  No notice of Landlord's intention to perform such covenants need be given Tenant unless expressly required by this Lease. Landlord shall not be liable to the Tenant for any loss or damage caused by acts of Landlord in remedying or attempting to remedy such default and Tenant shall pay to Landlord all reasonable expenses incurred by Landlord in connection with remedying or attempting to remedy such default.   Any expenses incurred by Landlord shall constitute Additional Rent and shall hereunder accrue interest from the date of payment by Landlord until repaired by Tenant at the highest rate permitted by law.

10.3    If Landlord exercises either of the remedies provided for in Section 10.2.1 and Section 10.2.2, Tenant shall surrender possession of and vacate the Premises and immediately deliver possession thereof to Landlord, in broom-clean condition, and Landlord may re-enter and take complete and peaceful possession of the Premises.

10.4    If Landlord terminates Tenant's right to possess the Premises without terminating this Lease, such termination of possession shall not release Tenant, in whole or in part, from Tenant's obligation to pay the Rent hereunder for the full Term.  In such event, Landlord shall be entitled to recover as damages all Rent and other sums due and payable to Landlord on the date of termination plus (1) an amount equal to the Rent and other sums provided herein to be paid by Tenant for the residue for the Term hereof, and (2) the cost of performing any other covenants to be performed by Tenant.  Alternatively, Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Rent and any other sums due and payable to Landlord during the period from the date of such notice of termination of possession to the stated end of the Term.  In any such case, Landlord may, but shall not be required or obligated to, re-let the Premises or any part thereof for the account of Tenant for such time (which may be for a term extending beyond the Term) and upon such terms as Landlord, in its sole discretion, shall determine and Landlord will not be responsible for failure to relet the Premises or, in the event of reletting, for failure to collect the rent therefor.  Landlord may let or relet other premises prior to reletting the Premises hereunder.  Also, in any such case, Landlord may make repairs, alterations and additions in or to the Premises to the extent reasonably necessary, and Tenant within thirty (30) days after written demand, shall pay the cost thereof, together with Landlord's reasonable expenses of re-letting (which are properly allocable to the period of the unexpired term only), such additional expenses to be construed under this Lease as Additional Rent.  Landlord shall collect the rents from any such re-letting and apply the same first to the payment of its unreimbursed expenses of re-entry, repair and alteration and its unreimbursed expenses of re-letting and second to the payment of Rent herein provided to be paid by Tenant, and any excess or residue, until the expiration of the Term, shall operate only as an offsetting credit against the amount of Rent due and owing which thereafter becomes due and payable hereunder.  No such reentry, repossession, repairs, alterations, additions or reletting shall operate to release Tenant, in whole or in part, from any of Tenant's obligations hereunder, and Landlord, at any time and from time to time, may sue and seek a judgment for any deficiencies from time to time remaining after the application of the proceeds of any such re-letting.  If the Premises or any part thereof be relet by Landlord for the unexpired portion of the

Term, or any part thereof, before presentation of proof of such damages to any court, commission or tribunal, the amount of rent reserved upon such reletting shall, prima facie, be the fair and reasonable rental value for the Premises, or part thereof, so relet during the term of the reletting.

10.5    All property removed from the Premises by Landlord pursuant to any provisions of this Lease or by law shall be handled, removed or stored by Landlord at the cost and expense of Tenant. Tenant shall pay Landlord for all expenses incurred by Landlord in such removal and for storage charges for such property so long as the same shall be in Landlord's possession or under Landlord's control. All such property not removed from the Premises or retaken from storage by Tenant within thirty (30) days after notice from Landlord, at Landlord's option, shall be deemed conclusively to have been conveyed by Tenant to Landlord as by bill of sale, without further payment or credit by Landlord to Tenant.

10.6    Tenant, for Tenant, and on behalf of any and all persons claiming through or under Tenant, including creditors of all kinds, does hereby waive and surrender all right and privilege which they or any of them might have under or by reason of any present or future law, to redeem the Premises or to have a continuance of this Lease for the Term after being dispossessed or ejected therefrom by process of law or under the terms of this Lease or after the termination of this Lease in accordance with its terms.

## ARTICLE 11
## DESTRUCTION AND RESTORATION

11.1    Subject to the provisions of <u>Section 11.3</u>:

11.1.1    If at any time during the Term hereof the Premises or the Building is destroyed or damaged and such damage is "substantial" (as herein defined), and such damage was caused by a casualty insured against under the provisions of this Lease, this Lease shall continue in full force and effect, and provided and only to the extent that Landlord actually receives insurance proceeds therefor ("Insurance Proceeds"), Landlord shall commence the repair of such damage by the date which is sixty (60) days following the later of (a) Landlord's receipt of notice from Tenant of the occurrence of such loss, (b) Landlord's receipt of insurance proceeds, or (c) Landlord's receipt of all required permits and approvals from all governmental authorities having jurisdiction. If Landlord is not in receipt of insurance proceeds and all required permits and approvals from all governmental authorities having jurisdiction within one hundred eighty (180) days of Landlord's receipt of notice from Tenant of the occurrence of such loss, Tenant shall have the option, as its sole and exclusive remedy against Landlord, to terminate the Lease upon written notice to Landlord, provided that such written notice is received by Landlord prior to the later to occur of (i) Landlord's receipt of insurance proceeds and (ii) Landlord's receipt of all required permits and approvals from all governmental authorities having jurisdiction.

11.1.2    If at any time during the Term hereof the Premises is damaged and such damage is not "substantial" (as hereinafter defined), Landlord shall commence the repair of such damage (unless caused by Tenant or its invitees, employees, contractors, agents or other persons under Tenant's control) and if such non-substantial damage is caused by a casualty insured against under the provisions of this Lease, Landlord shall commence such repair as soon as is reasonably possible after (and only to the extent of) Landlord's receipt of insurance proceeds, and this Lease shall continue in full force and effect.

11.1.3    Subject to the provisions of <u>Section 11.2</u> and <u>Section 11.3</u>, if at any time during the Term hereof the Premises or the Building is destroyed or damaged and if such damage is "substantial" (as hereinafter defined),or such damage or casualty is not of the type covered by the insurance required to be carried pursuant to this Lease, then Landlord at its option shall either (i) commence the repair of such damage at Landlord's expenses, in which event this Lease shall continue in full force and effect, or (ii) cancel and terminate this Lease as of the date of the occurrence of such damage, by giving Tenant written notice of its election to do so within sixty (60) days after the date of occurrence of such damage.

11.2    If the Premises or the Building is destroyed or damaged during the last two (2) years of the Term of this Lease and the estimated cost of repair exceeds twenty-five percent (25%) of the replacement cost of the Premises prior to such destruction or damage, either party may, at its option, cancel and terminate this Lease as of the date of occurrence of such damage by giving written notice to the other of its election to do so ("Cancellation Notice") within thirty (30) days after the date of occurrence of such damage. If neither party shall elect to

terminate this Lease, the repair of such damage shall be governed by <u>Section 13.1</u> or <u>Section 13.2</u>, as the case may be.

11.3    With respect to destruction and restoration:

11.3.1    If the Premises is destroyed or damaged, Tenant shall continue the operation of its business in the Premises to the extent reasonably practicable from the standpoint of prudent business management, and the Rent payable hereunder for the period during which such damage, repair, or restoration continues shall be abated in proportion to the degree of which Tenant's use of the Premises is impaired until either such damage is repaired or this Lease is terminated pursuant to the terms of this <u>Article 11</u>.  Tenant shall have no claim against Landlord for any damage suffered by Tenant by reason of such damage, destruction, repair, or restoration.

11.3.2    If Landlord shall be obligated to repair or restore the Premises under the provisions of this Article, Landlord shall provide Tenant with Landlord's reasonably anticipated timeline for restoration ("Landlord's Restoration Estimate").  If (i) Landlord shall not commence such repair or restoration within sixty (60) days after Landlord's obligation to restore shall accrue pursuant to <u>Section 11.1.1</u> above, and thereafter diligently pursue same in a reasonable manner to completion, or (ii) such repair or restoration, per Landlord's Restoration Estimate, is anticipated to take longer than two hundred seventy (270) days from the date of Landlord's receipt of notice from Tenant of the occurrence of such casualty, Tenant may at its option cancel and terminate this Lease, as its sole and exclusive remedy against Landlord, as of the date of occurrence of such damage by giving Landlord written notice of its election to do so (x) as to a termination under clause (i) above, with respect to any failure to commence, at any time prior to the commencement of such repair or restoration or, with respect to any failure to diligently pursue restoration, upon the occurrence of any such failure after commencement; provided, however, that with respect to the first occurrence in which Landlord ceases to diligently pursue restoration, Tenant's termination right shall only be effective if Landlord does not recommence the diligent pursuit of restoration within fifteen (15) days of receipt thereof, or (y) as to a termination under clause (ii) above, within five (5) business days of Tenant's receipt of Landlord's Restoration Estimate.  Further, in the event that Landlord has not in fact completed restoration within two hundred seventy (270) days from the date of Landlord's receipt of notice from Tenant of the occurrence of such casualty, Tenant shall have the option, as its sole and exclusive remedy against Landlord, to terminate the Lease upon written notice to Landlord, provided that said completion is not reasonably anticipated to be completed within thirty (30) days of the date that Tenant gives written notice. Tenant shall not claim that Landlord is not diligently pursuing the repair or restoration if said repair or restoration is delayed due solely to acts of God, governmental restrictions, strikes, labor disturbances, shortages of materials or supplies, actions or inactions of governmental authorities or any other cause or event beyond Landlord's or Tenant's reasonable control.

11.4    In the event of any reconstruction of the Premises under this Article, said reconstruction shall be in substantial conformity with the condition of the Premises which Landlord was required to deliver at the Commencement Date and Landlord's obligation to reconstruct the Premises shall be only to the extent of such condition.  Tenant, at its sole cost and expense, shall be responsible for the repair and restoration of all items constructed on or brought upon the Premises by Tenant and the replacement of its stock in trade, trade fixtures, furniture, furnishings, and equipment and merchandise hereof promptly upon delivery to it of possession of the Premises and shall diligently prosecute such installation to completion.

11.5    Upon any termination of this Lease under any of the provisions of this Article, the parties shall be released thereby without further obligations to the other party coincident with the surrender of possession of the Premises to Landlord except for items which have theretofore accrued and be then unpaid.

11.6    For the purpose of this Article,

11.6.1    "substantial" damage to the Premises shall be deemed to be damage, the estimated cost of repair of which exceeds twenty (20%) percent of the replacement cost of the Building or the Premises, as the case may be;

11.6.2    the determination in good faith by Landlord, provided same is based upon a construction bid from a reputable general contractor, or appropriate subcontractors, of the estimated cost of repair of any damage

and/or the estimated replacement cost of any Improvements shall be conclusive for the purpose of this Article; and

11.6.3     all time periods and requirements imposed on Landlord (collectively, "Deadlines") within this Article are subject to delays in the reconstruction efforts caused by or contributed to by Tenant or its agents, employees, representatives, contractors, subcontractors, consultants or invitees (such delay, a "Tenant Delay"). In an instance of Tenant Delay, any and all affected Deadlines shall be extended on a day-for-day basis.

11.7     The provisions of this Article shall be considered an express agreement governing any case of damage or destruction of the Demised Premises by fire or other casualty, and §227 of the Real Property Law of the State of New York, providing for such a contingency in the absence of an express agreement, and any other law of like import, now or hereafter in force, shall have no application in such case.

## ARTICLE 12
## CONDEMNATION

12.1     If, during the Term, the entire Premises or the Building, or such portion thereof as Landlord, in its reasonable discretion, determines would render the Premises or the Building unusable, shall be taken as the result of the exercise of the power of eminent domain or conveyed under threat thereof (hereinafter referred to as the "Proceedings"), this Lease and all right, title and interest of Tenant hereunder shall terminate on the earlier of taking of possession by the condemning authority or the date of vesting of title pursuant to such Proceedings. The entire condemnation award for the Premises shall be payable to Landlord without any deduction whatsoever, for the value of Tenant's leasehold estate or otherwise and Tenant shall receive no part of such award; provided, however, that Tenant shall be entitled to a make a claim for a separate award as may be allowed to tenants generally for such trade fixtures and other personal property of Tenant as Tenant has a right to remove at the expiration of this Lease as provided hereunder, as well as any relocation expenses to which Tenant is entitled under applicable law; provided however that Landlord's award is not thereby reduced or otherwise adversely affected.

12.2     If during the Term, less than the entire Premises or the Building shall be taken, but such taking, in Landlord's reasonable judgment, shall not render the Premises or the Building unusable, this Lease, upon the earlier of taking of possession by the condemning authority or vesting of title in the Proceedings, shall terminate as to the parts so taken. Landlord and Tenant shall each be entitled to awards for damages as set forth in Section 12.1. Notwithstanding anything to the contrary in the foregoing, if any portion of the Premises or the Building shall be taken which shall materially interfere with Tenant's ability to operate in the Premises or shall cause a material loss of parking, Tenant shall have the right to terminate the Lease upon written notice to Landlord. If this Lease is not terminated following such a condemnation or taking, subject to the rights of the Mortgagee, Landlord, as soon as reasonably practicable after such condemnation or taking and the termination and payment of Landlord's award on account thereof, shall expend as much as may be necessary of the net amount which is awarded to Landlord and released by Mortgage, if any, in restoring, to the extent originally constructed by Landlord (consistent, however, with zoning laws and building codes then in existence), so much of the Premises as was originally constructed by Landlord to an architectural unit as nearly like its condition prior to such taking as shall be practicable. Should the net amount so awarded to Landlord be insufficient, in the reasonable estimate of Landlord, to cover the cost of restoring the Premises and the Building, Landlord may, but shall have no obligation to, supply the amount of such insufficiency and restore the Premises to such an architectural unit, with all reasonable diligence, or Landlord may terminate this Lease by giving notice to Tenant within a reasonable time after Landlord has determined the estimated net amount which may be awarded to Landlord and the estimated cost of such restoration. If the net amount so awarded is insufficient to restore the Premises and the Building and should Landlord elect not to pay the deficiency, Landlord shall, prior to electing to terminate this Lease, notify Tenant, in writing, of the amount of such deficiency and Tenant shall have fifteen (15) days after receiving Landlord's notice within which to advise Landlord, in writing, whether or not Tenant elects to pay such deficiency and, if so, to simultaneously deliver to Landlord a check in payment of the amount of the deficiency. If Tenant does not timely elect and pay to Landlord the amount of such deficiency, this Lease shall terminate immediately.

12.3     In the event of any termination of this Lease, or any part thereof, as a result of any such Proceedings, Tenant shall pay to Landlord all Rent and all other charges payable hereunder with respect to that portion of the Premises so taken, apportioned to the date of such termination.

12.4    If neither Landlord or Tenant elects to terminate this Lease in the event of a partial taking of the Premises or the Building, the Rent payable hereunder during the period from and after the earlier of the taking of possession by the condemning authority and the date of vesting of title in such Proceedings through to the expiration or termination of this Lease (as the Term may be extended) shall abate and be diminished in proportion to the reduction in rentable area of the Premises by reason of the condemnation or taking.

12.5    If the temporary use or occupancy of all or any part of the Premises shall be lawfully taken by condemnation or in any other manner for any public or quasi-public use or purpose during the Term, Tenant shall be entitled, except as hereinafter set forth, to receive that portion of the award for such taking which represents compensation for the use and occupancy of the Premises, and Landlord shall be entitled to receive that portion which represents reimbursement for the cost of restoration of the Premises. For the period of any such taking, Rent shall abate and be diminished in proportion to the reduction in rentable area of the Premises by reason of such taking for the duration of such taking. The Lease shall otherwise be and remain unaffected by such taking and Tenant shall continue responsible for all of its obligations hereunder insofar as such obligations are not affected by such taking. If the period of temporary use or occupancy shall extend beyond the expiration of the term, that part of the award which represents compensation for the use or occupancy of the Premises (or a part thereof) shall be divided between Landlord and Tenant so that Tenant shall receive so much thereof as represents the period prior to the expiration of the Term and Landlord shall receive so much thereof as represents the period subsequent to the expiration of the Term. All moneys received by Tenant as, or as part of, an award for temporary use and occupancy for a period beyond the date to which the Rents hereunder have been paid by Tenant shall be received, held and applied by Tenant as a trust fund for payment of the rents falling due hereunder.

## ARTICLE 13
## ASSIGNMENT AND SUBLETTING

13.1    Tenant, shall not, any time during the Term, without Landlord's advance written consent, which consent will not be unreasonably withheld, delayed or conditioned upon payment or consideration (except such payment or consideration as is required to be paid or made hereunder): (a) assign or transfer this Lease or any interest under it; or (b) sublet the Premises or any part thereof. If Landlord does consent to an assignment, such consent shall not relieve Tenant from liability for performance of any covenant or obligation hereunder, and Tenant shall continue to remain jointly and severally  primarily liable with the assignee(s) for performance of any covenant or obligation hereunder accruing from and after such assignment. No subletting shall relieve Tenant from liability for performance of any covenant or obligation hereunder. The word "assignment" as used herein shall include a Mortgage or other encumbrance of this Lease or of the Premises or any part thereof or a transfer of a controlling interest in, the ownership interest of Tenant or of any entity directly or indirectly controlling Tenant. Notwithstanding the foregoing, Landlord's consent shall not be required in the event Tenant desires to assign this Lease or sublet all or any portion of the Premises to any subsidiary of Tenant, or any direct or indirect subsidiary of Tenant's parent corporation (an "Affiliate") or should Tenant or its parent corporation merge with another entity or sell all or a substantial portion of Tenant's assets (including Tenant's interest in this Lease) to a third party (the "Successor"), provided the Successor's net worth (determined in accordance with generally accepted accounting principles) is at least equal to or better than that of Tenant at the time of such assignment or sublet or on the date hereof, whichever is better. Landlord shall have fifteen (15) days from date of Landlord's receipt of Tenant's written request for consent to assign or sublet and receipt by Landlord of all information reasonably requested by Landlord, within which to respond, in writing, to such Tenant's request. In determining whether or not to grant or withhold its consent, Landlord may consider, without limitation, the following factors: (a) the assignee's or subtenant's use of the Premises; (b) the assignee's or subtenant's financial status and creditworthiness (as compared to the Tenant at the Commencement Date); (c) the compatibility of the assignee and/or subtenant and its use with or upon other owners, tenants and buildings, or proposed owners, tenants or buildings; (d) the use of hazardous or toxic materials; (e) any increased costs or risks which may be suffered by Landlord or any of the other tenants in the Building; (f) parking requirements; (g) the effect of such assignee or subtenant upon Landlord's sales and leasing operations within the Development; and (h) any need to alter the Premises. Notwithstanding Tenant's continuing liability hereunder, the financial ability of any proposed assignee or subtenant and of the required sureties shall be deemed to be material in Landlord's consideration of any proposed assignment or sublet hereunder. Any attempted assignment, transfer, or subletting without such consent shall, at the option of Landlord, constitute grounds for termination of this Lease or an Event of Default under <u>Article 10</u> of this Lease. Landlord shall have the right to require Tenant to furnish Landlord with any information reasonably requested by Landlord relating to proposed assignee's or subtenant's financial condition, the proposed assignee's or subtenant's business history and

background, including that of the principals, and the financial condition of any required sureties. If it shall be determined by a court having proper jurisdiction that Landlord's consent has been unreasonably withheld, Landlord shall in no event be liable for any money judgment by reason thereof. Notwithstanding any provision in this Lease to the contrary, if an Event of Default has occurred which is continuing, Landlord may withhold its consent to any assignment or subletting in its sole and absolute discretion. With respect to each and every sublease or subletting authorized by Landlord under the provisions of this Lease, it is further agreed that (i) no subletting shall be for a term ending later than one day prior to the expiration date of this Lease; (ii) no sublease shall be valid, and no subtenant shall take possession of the Premises or any part thereof, until an executed counterpart of such sublease has been delivered to Landlord; (iii) each sublease shall provide that it is subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and that in the event of termination, re-entry or dispossess by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublandlord, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not (1) be liable for any previous act or omission of Tenant under such sublease, (2) be subject to any offset, not expressly provided in such sublease, which theretofore accrued to such subtenant against Tenant, or (3) be bound by any previous modification of such sublease or by any previous prepayment of more than one month's rent.

13.2     Tenant shall not have the right to request landlord's consent to an assignment of this Lease or a subletting of all or any part of the Premises if an Event of Default shall have occurred and shall be continuing. If Tenant shall assign this Lease, the assignee expressly shall assume in writing all of the obligations of Tenant hereunder and the assigning Tenant shall not be relieved of any obligations under this Lease as more particularly set forth in Section 13.1.

13.3     Tenant shall be required to furnish to Landlord, within no more than ten (10) days from the date of such occurrence, copies of all documents evidencing any such assignment and assumption or sublease. Each subletting or assignment to which Landlord has consented shall be by an instrument in writing in form reasonably satisfactory to Landlord, and shall be executed by the sublandlord or assignor and by the subtenant or assignee in each instance, as the case may be. Each assignee shall agree in writing for the benefit of Landlord herein to assume, to be bound by, and to perform the terms, covenants, and conditions of this Lease to be done, kept, and performed by Tenant.

13.4     Notwithstanding the provisions in Section 13.1 above providing for Landlord's consent not to be unreasonably withheld, should Tenant in good faith believe that Landlord's consent has been unreasonably withheld, Tenant's sole remedy shall be as set forth in Section 19.18.

13.5     Landlord's consent, if any, may be conditioned upon Tenant paying to Landlord Landlord's reasonable attorneys' and reasonable accountants' fees and costs incurred by Landlord relating to assignment of this Lease or subletting of the Premises, said payment being due from Tenant to Landlord simultaneously with the granting of Landlord's consent.

13.6  .   If Tenant shall either assign this Lease or sublease (singularly or in the aggregate) a portion or all of the Premises, and (x) with respect to an assignment, any compensation, payment or consideration (including consideration on account of value of the use and occupancy rights created by this Lease or the leasehold estate created hereby, and whether in money, property or other items of value) is paid or delivered or called for to be paid or delivered, or (y) with respect to a sublease, the rent or any other compensation or consideration paid or called for to be paid, in or in connection with such sublease, exceeds the Rent or pro rata portion of the Rent, as the case may be, for the Premises or portion thereof, Tenant shall pay Landlord fifty percent (50%) of such excess (after deduction of Tenant's reasonable direct out of pocket expenses associated with such assignment or subleasing, including, without limitation, reasonable attorneys' fees and free rent periods, subtenant improvements (amortized over the term of the subtenant's sublease), and costs and brokerage fees incurred in connection with such assignment) when received by Tenant. For the purposes of this Section 13.6, the term "rent" shall mean all fixed rent or minimum rent, all additional rent or other payments or consideration (whether in money, property or other items of value), or both, payable for the use and occupancy of all or a portion of the Premises, or both, as applicable. The provisions of this Section 13.6 shall apply to each and every assignment of this Lease and to each and every subletting of all or a portion of the Premises during the Term.

13.7     If this Lease be assigned, or if the Premises or any part thereof be sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent herein reserved, but no assignment, subletting, occupancy or collection shall be deemed a waiver of the provisions hereof, the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Landlord to an assignment or sublease shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or sublease. In no event shall any permitted subtenant, assign or encumber its sublease or further sublet all or any portion of its sublet space, or otherwise suffer or permit the sublet space or any part thereof to be used or occupied by others, without Landlord's prior written consent in each instance which will be granted or deemed on the same basis as a similar request by Tenant.

13.8     In the event an order for relief is entered in favor of Tenant under the provisions of the United States Bankruptcy Code, as amended, 11 U.S.C. §101 et seq. (hereinafter referred to as the "Bankruptcy Code"), this Lease may not be assigned by Tenant or any Trustee of Tenant unless this Lease is first assumed in accordance with the provisions of Section 365 of the Bankruptcy Code. At the time of such assumption, Tenant or Tenant's Trustee shall cure all defaults under this Lease, which, with respect to the curing of rent arrearages, shall require full payment thereof, in cash or cash equivalent, on or before the assumption, and Tenant or Tenant's Trustee shall provide adequate assurance of future performance by the assignee under this Lease, including, without limitation, the deposit with Landlord of a security deposit in an amount equivalent to the monthly rental due for the next succeeding three (3) months after the assumption. In the event this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other consideration constituting Tenant's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease and any amendments and/or rules and regulations relating thereto, on and after the date of such assignment.

## ARTICLE 14
## SUBORDINATION, NON-DISTURBANCE,
## NOTICE TO MORTGAGEE AND
## ATTORNMENT

14.1     This Lease is and shall be subject and subordinate to the lien of any Mortgage which is or at any time may be placed upon the Premises, or any portion thereof or any interest therein, and to all present and future ground or underlying leases of the Land, and to any replacements, renewals, amendments, modifications, extensions or refinancing of any of the foregoing, and to each and every advance made under any Mortgage (unless the Mortgagee requires in writing that this Lease be superior thereto). The provisions of this Section 14.1 shall only be operative if Tenant is given a commercially reasonable subordination, non-disturbance and attornment agreement ("SNDA") from the holder of any such Mortgage. Tenant agrees at any time hereafter, and from time to time within thirty (30) days after demand of Landlord, to execute and deliver to Landlord any commercially reasonable instruments, releases or other documents that reasonably may be required to effect or confirm the subordination or superiority of this Lease to the lien of any such Mortgage. The lien of any Mortgage shall not cover Tenant's trade fixtures or other personal property located in or on the Premises. Notwithstanding the foregoing, promptly after Tenant's written request, Landlord shall use commercially reasonable efforts to cause Landlord's lender to execute an SNDA using the form of SNDA attached hereto as Exhibit E (which shall be deemed commercially reasonable for the purposes of this Lease), and Tenant shall execute such SNDA within ten (10) days of Landlord's request therefor.

14.2     If any Mortgagee shall succeed to the rights of Landlord under this Lease or to ownership of the Premises, whether through foreclosure or the delivery of a deed in lieu thereof, then Tenant shall automatically become the tenant of such Mortgagee and Tenant shall attorn to and recognize such Mortgagee as Tenant's landlord under this Lease, and shall execute and deliver any instrument that such Mortgagee may reasonably request to evidence such attornment provided, however, that such Mortgagee or successor in interest shall not be bound by (a)

any payment of Base Rent or Additional Rent for more than one (1) month in advance except prepayments in the nature of security for the performance by Tenant of its obligations under this Lease, (b) any amendment or modification of this Lease, or any waiver of the terms of this Lease, made without the written consent of such Mortgagee, (c) any offset right that Tenant may have against any former landlord relating to any event or occurrence before the date of attornment, including any claim for damages of any kind whatsoever as the result of any breach by a former landlord that occurred before the date of attornment; (d) any obligation (i) to pay Tenant any sum(s) that any former landlord owed to Tenant unless such sums, if any, shall have actually been delivered to the Mortgagee by way of an assumption of escrow accounts or otherwise; (ii) with respect to any security deposited with a former landlord, unless such security was actually delivered to such Mortgagee; (iii) to commence or complete any initial construction of improvements in the Premises or any expansion or rehabilitation of existing improvements thereon; (iv) to reconstruct or repair improvements following a fire, casualty or condemnation (subject to the terms of any SNDA between Mortgagee and Tenant); or (v) arising from representations and warranties related to a former landlord; or (e) any consensual or negotiated surrender, cancellation, or termination of this Lease, in whole or in part, agreed upon between former landlord and Tenant, unless effected unilaterally by Tenant pursuant to the express terms of this Lease or consented to in writing by the Mortgagee. Upon request by such Mortgagee, whether before or after the enforcement of its remedies, Tenant shall execute and deliver an instrument or instruments confirming and evidencing the attornment herein set forth. This Lease is further subject to and subordinate to all matters of record. Subject to the terms of Section 19.7 hereof, in the event of any other transfer of Landlord's interest hereunder, upon the written request of the transferee and Landlord, and provided such transferee agrees in writing to assume and be bound by all of Landlord's obligations hereunder, Tenant shall attorn to and recognize such transferee as Tenant's landlord under this Lease and shall execute and deliver any instrument that such transferee and Landlord reasonably may request to evidence such attornment.

14.3    Tenant will give any Mortgagee, by registered mail, a copy of any notice of default Tenant serves on Landlord, provided that Landlord or the Mortgagee previously notified Tenant (by way of notice of assignment of rents and leases or otherwise) of the address of the Mortgagee. Tenant further agrees that if Landlord fails to cure such default within the time provided for in this Lease, then Tenant will provide written notice of such failure to the Mortgagee and the Mortgagee will have an additional thirty (30) days within which to cure the default. The Mortgagee shall have no obligation to cure (and shall have no liability or obligation for not curing) any breach or default by Landlord, except to the extent that the Mortgagee agrees or undertakes otherwise in writing. If the default cannot be cured within the additional thirty (30) day period, then the Mortgagee will have such additional time as may be necessary to effect the cure if, within the thirty (30) day period, the Mortgagee has commenced and is diligently pursuing the cure (including without limitation commencing foreclosure proceedings if necessary to effect the cure).

14.4    Within ten (10) days after written request by Landlord, a prospective purchaser or lender, Tenant shall deliver in a form supplied by Landlord, subject to such form being in commercially reasonable form and to edits reasonably requested by Tenant, an estoppel certificate to Landlord as to the status of this Lease, including whether this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified and identifying the modification agreements); the amount of Base Rent and Additional Rent then being paid and the dates to which same have been paid; whether or not there is any existing or alleged default by either party with respect to which a notice of default has been served, or any facts exist which, with the passing of time or giving of notice, would constitute a default, and if there is any such default or facts, specifying the nature and extent thereof; and any other matters pertaining to this Lease as to which Landlord shall request such certificate. Landlord, and any prospective purchaser or lender shall have the right to rely on such certificate.

## ARTICLE 15
## SIGNS

15.1    Tenant may not erect any signs on the exterior or interior of the Premises or Building or anywhere within the Development, or on the interior of the Premises, which signs are visible from the exterior of the Premises, unless such signs (i) do not cause any irreparable structural damage or other damage to the Premises or Building; (ii) do not violate applicable governmental laws, ordinances, rules or regulations (Tenant having obtained and maintained in full force and effect all required permits and approvals); and (iii) do not violate any covenants, conditions or restrictions affecting the Premises. Any signs on the exterior of the Premises or on the interior of the

Premises, which signs are visible from the exterior of the Premises, shall require Landlord's prior written consent, which consent will not be unreasonably withheld, delayed or conditioned upon payment or consideration (except such payment or consideration as is required to be paid or made under this Lease). Specifications for the initial signs to be affixed to the Premises shall be submitted by Tenant to Landlord, for Landlord's approval. The cost for such approved signs shall be borne by Tenant.

## ARTICLE 16
## LANDLORD'S ACCESS

16.1    Tenant agrees to permit Landlord and its authorized representatives, at Landlord's sole cost and expense, to enter upon the Premises at all reasonable times during ordinary business hours, upon not less than twenty-four (24) hours' prior notice (except in the event of an emergency in which event no prior notice will be required), for the purpose of inspecting the same and making any necessary repairs or replacements which are the obligation of Landlord. Landlord may, during the progress of any work required hereunder, keep and store upon the Premises all reasonably necessary materials, tools and equipment.

16.2    Landlord is hereby also given the right at all reasonable times during ordinary business hours, upon not less than twenty-four (24) hours' prior notice, to enter upon the Premises and to exhibit the same for the purpose of mortgaging or selling the same or, during the final twelve (12) months of the Term, leasing the same.

16.3    In exercising its rights hereunder, Landlord shall use such efforts as are reasonable under the circumstances to refrain from any acts which may interfere with Tenant's use or occupancy of the Premises or access thereto. Without limiting the generality of the foregoing, Landlord acknowledges that it is necessary for Tenant to control access to the Premises in order to avoid unauthorized persons from viewing Tenant's trade secrets, proprietary products, technology and/or processes. Accordingly, while within the Premises, Landlord and its representatives, at Tenant's option, and to the extent reasonable under the circumstances, shall be accompanied by a representative of Tenant and shall comply with reasonable directions of such representative relative to safety and to the protection of Tenant's trade secrets and other proprietary information.

## ARTICLE 17
## SURRENDER AND HOLDING-OVER

17.1    Upon termination of this Lease, whether by forfeiture, lapse of time or otherwise, or upon termination of Tenant's right to possession of the Premises, Tenant will at once surrender and deliver up the Premises, together with all improvements thereon, to Landlord, in good condition and repair, reasonable wear and tear and damage by casualty and condemnation excepted. Said improvements shall include all plumbing, lighting, electrical, heating, cooling and ventilating fixtures and equipment, and all alterations.

17.2    Upon termination of this Lease, Tenant shall remove Tenant's personal property, trade fixtures and equipment (to the extent the same do not constitute an integral part of the Premises); provided, however, that Tenant shall repair any injury or damage to the Premises which may result from such removal and shall restore the Premises to the same condition as existed prior to the installation thereof. If Tenant does not remove Tenant's personal property, trade fixtures and equipment from the Premises prior to the expiration or earlier termination of the Term, Landlord, upon ten (10) days' notice to Tenant, at its option, may remove the same (and repair any damage occasioned thereby) and dispose thereof or deliver the same to any other place of business of Tenant or warehouse the same, and Tenant shall pay the cost of such removal, repair, delivery and warehousing to Landlord within thirty (30) days after demand therefor.

17.3    Tenant shall have no right to occupy the Premises or any portion thereof after the expiration of this Lease or after the termination of this Lease or of Tenant's right to possession pursuant to Article 10 hereof. In the event Tenant or any party claiming by, through or under Tenant holds over, Landlord may exercise any and all remedies available to it at law or in equity to recover possession of the Premises, and for damages. If Tenant shall hold over after the expiration of the Term or the earlier termination of this Lease, Tenant shall pay monthly Base Rent equal to one hundred fifty percent (150%) of the Base Rent payable during the final full month of the applicable year (exclusive of abatements, if any) in which such expiration or termination occurs, together with an amount reasonably estimated by Landlord for the monthly Additional Rent payable under this Lease, and shall

otherwise be on the terms and conditions herein specified so far as applicable (but expressly excluding all renewal or extension rights). No holding over by Tenant after the Term shall operate to extend the Term. Any holding over with Landlord's written consent shall be construed as a tenancy at sufferance or from month to month, at Landlord's option. Any holding over without Landlord's written consent shall entitle Landlord to reenter the Premises as provided in Section 10.2, and to enforce all other rights and remedies provided by law or this Lease.

17.4    All damages to Landlord by reason of holding over by Tenant may be the subject of a separate action and need not be asserted by Landlord in any summary proceedings against Tenant.

17.5    Notwithstanding anything to the contrary contained in this Lease, the acceptance of any rent or use and occupancy payments paid by Tenant pursuant to Section 17.3 shall not preclude Landlord from commencing and prosecuting a holdover or summary eviction proceeding, and the preceding sentence shall be deemed to be an "agreement expressly providing otherwise" within the meaning of §232-c of the Real Property Law of the State of New York.

17.6    Tenant expressly waives, for itself and for any person claiming through or under Tenant, any rights which Tenant or any such person may have under the provisions of §2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force, in connection with any holdover summary proceedings which Owner may institute to enforce the foregoing provisions of this Lease.

## ARTICLE 18
## HAZARDOUS AND TOXIC MATERIALS

18.1    As used herein:

18.1.1    "Claim" shall mean and include any demand, cause of action, Proceeding or suit (i) for damages, liabilities, costs, losses, injuries to person or property, damages to natural resources, fines, penalties, interest, or contribution; (ii) for the costs of site investigations, feasibility studies, information requests, health or risk assessments or Response (as such term is herein defined) actions; or (iii) for enforcing this Article 18.

18.1.2    "Environmental Law" shall mean and include all federal, state and local statutes, ordinances, regulations and rules relating to environmental quality, health, safety, contamination and clean-up, including, without limitation, the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Clean Water Act, 33 U.S.C. Section 1251 et seq., and the Water Quality Act of 1987; the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.W. Section 136 et seq.; the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. Section 1401 et seq.; the National Environmental Policy Act, 42 U.S.C. Section 4321 et seq.; the Noise Control Act, 42 U.S.C. Section 4901 et seq.; the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. Section 6901 et seq., as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. Section 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act; the Emergency Planning and Community Right-to-Know Act; the Radon Gas and Indoor Air Quality Research Act; the Toxic Substances Control Act ("TSCA"), 15 U.S.C. Section 2601 et seq.; the Atomic Energy Act, 42 U.S.C. Section 2011 et seq., and the Nuclear Waste Policy Act of 1982, 42 U.S.C. Section 10101 et seq.; .); the New York State Environmental Conservation Law, Chapter 43-B, Consolidated Laws of New York; the New York State Navigation Law, Article 12, §170-§204, et seq.; each as amended or supplemented from time to time, and any state lien and superlien and environmental clean-up statutes, with implementing regulations and guidelines. Environmental Laws shall also include all state, regional, county, municipal and other local laws, regulations and ordinances insofar as they are equivalent or similar to the state and federal laws recited above or purport to regulate Hazardous Materials, and regulations, orders, decrees, permits, licenses and deed restrictions now or hereafter promulgated thereunder, and amendments and successors to such statutes and regulations as may be enacted and promulgated from time to time.

18.1.3    "Hazardous Materials" shall mean and include the following, including mixtures thereof: any hazardous substance, pollutant, contaminant, waste, by-product or constituent regulated under any Environmental Law.

18.1.4　"Management" or "Manage" means to generate, manufacture, process, treat, store, use, re-use, refine, discharge, recycle, reclaim, blend or burn for energy recovery, incinerate, accumulate speculatively, transport, transfer, dispose of or abandon Hazardous Materials into the environment, as "environment" is defined in CERCLA.

18.1.5　"Release" or "Released" shall mean any actual or threatened spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of Hazardous Materials into the environment, as "environment" is defined in CERCLA.

18.1.6　"Response" or "Respond" shall mean action taken in compliance with Environmental Laws to correct, remove, remediate, clean up, prevent, mitigate, monitor, evaluate, investigate, assess or abate the Release of a Hazardous Material.

18.2　During the Term, Tenant, at its sole cost and expense, shall (a) comply with all the Environmental Laws relating to its use and manner of use of the Premises, and permits issued thereunder; (b) conduct any Management of Hazardous Materials by Tenant on the Premises in compliance with Environmental Laws; (c) not cause or allow the Release of any Hazardous Materials on, to or from the Premises, except in compliance with Environmental Laws and permits issued thereunder; (d) arrange for the lawful transportation and off-site disposal of all Hazardous Materials that it generates; and (e) secure, maintain, and comply with all permits required by Environmental Laws in connection with Tenant's use of the Premises. Prior to using, storing, or maintaining any Hazardous Materials on or about the Premises, Tenant shall provide to Landlord a plan regarding Hazardous Waste Management (a "Management Plan") which shall include a list of the types and quantities of any Hazardous Materials to be used, stored, or maintained, a description of the response steps Tenant shall take to inspect for, detect, minimize, and mitigate any release of Hazardous Materials and the name, telephone number and qualification of a licensed company that will handle emergency clean-up for Tenant. Tenant shall immediately deliver to Landlord a revised Management Plan each time the Tenant adds or changes the types and quantities of Hazardous Materials to be used, stored or maintained. Tenant shall at all times strictly comply with the Management Plan. Tenant shall also provide Landlord with a copy of any Hazardous Materials inventory statement required by any applicable regulations or Environmental Laws, and any reports required by any and all regulatory agencies.

18.3　Tenant shall give written notice to Landlord at least seven (7) days in advance of any production, generation, handling, storage, treatment, transportation, disposal, release, or removal of hazardous waste or hazardous substances from or on the Premises. Tenant warrants and represents that it will not use or employ Landlord's and/or the Building property, facilities, equipment, or services to handle, transport, store, treat, or dispose of any hazardous waste or hazardous substance, whether or not it was generated or produced on the Premises; and Tenant further warrants and represents that any activity on or relating to the Premises shall be conducted in full compliance with all applicable laws. In addition, Landlord reserves the right to cause the Premises to be periodically inspected (but not more than twice per year) by a reputable environmental consulting firm. The reasonable cost of such inspections, as well as the cost to comply with such consultant's recommendations, shall be fully paid by Tenant within ten (10) days after receiving a statement of charges from Landlord.

18.4　Tenant shall provide Landlord with the results of environmental studies, reports and tests, with transportation and disposal contracts for Hazardous Materials, with any permits issued under Environmental Laws and with any other relevant or applicable documents pertaining to the condition of the Premises or demonstrating that Tenant complies with this Article 18 and all Environmental Laws relating to the Premises. Landlord agrees that any documents or information furnished by Tenant to Landlord under this Article 18 shall be confidential and shall not be disclosed to any third party (with the exception of Mortgagees, prospective purchasers, or Landlord's attorneys, underwriters, consultants, contractors, and investors), unless required by law, without the prior consent of Tenant, which consent will not be unreasonably withheld.

18.5　If Tenant's Management of Hazardous Materials at the Premises or Tenant's use of the Premises (a) results in a Release which is not in compliance with Environmental Laws or permits issued thereunder; (b) gives rise to liability or a Claim or requires a Response under common law or any Environmental Law or permit issued thereunder; (c) causes a significant public health effect; or (d) creates a nuisance, Tenant, in any and all such occurrences and at its sole cost and expense, shall: (i) immediately notify Landlord verbally and in writing of any Release, which notice shall identify the Hazardous Materials involved and the emergency procedures taken or to be

taken; and, (ii) promptly take all applicable action in Response in compliance with all applicable laws; provided that Landlord's approval of the remediation plan to be undertaken by Tenant shall first be obtained.

18.6     Any increase in the premium for any insurance carried by Landlord on the Building, the Real Property or the Development which arises from Tenant's use and/or storage of Hazardous Materials shall be fully paid by Tenant within ten (10) days after Tenant's receipt of a statement from Landlord. Tenant shall procure and maintain at its sole cost and expense, such additional insurance as may be necessary to comply with any requirement of any federal, state or local governmental agency or special district.

18.7     If the Tenant shall breach any of the warranties, representations, agreements or covenants in this Article 18 or if the presence of Hazardous Materials on the Premises caused or permitted by Tenant results in contamination of the Premises, the Building or any adjacent real properties, then Tenant shall indemnify, defend and hold Landlord, its partners, officers, managing agents and mortgagees, their heirs, successors and assigns, harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities and losses (including without limitation, diminution in value of the Premises, the Building or the Development, damages for the loss or restriction on the use of rentable or usable space or any amenity of the Premises or the Building, damages arising from any adverse impact on marketing of space in the Building or the Development, sums paid in settlement of claims, actual attorneys' fees and costs, whether suit is brought or not, consultant's fees and expert fees) which arise during or after the term of the Lease as a result of such contamination; provided, however, that Landlord shall be solely responsible for the costs related to any Hazardous Materials present in the Building or the Development prior to the Commencement Date or that are introduced during the Term by Landlord. This indemnification includes, without limitation, costs incurred in connection with any investigation of site conditions, including regular inspections, or any clean-up, remedial, removal or restoration work required or recommended by any federal, state or local governmental agency or political subdivision because of the presence of Hazardous Materials. The indemnity, defense and hold harmless obligations of Tenant set forth in this Article 18 shall survive the expiration or earlier termination of this Lease.

**ARTICLE 19**
**MISCELLANEOUS PROVISIONS**

19.1     To the fullest extent allowed by law, Tenant, at all times, shall indemnify, defend and hold Landlord, its officers, directors, employees and agents, harmless from and against any and all claims by or on behalf of any person or persons, firm or firms, corporation or corporations, arising from the conduct or management of or from any work or things whatsoever done in or about, the Premises (except to the extent arising out of Landlord's negligence or other wrongful conduct), and further will indemnify, defend and hold Landlord, its officers, directors, employees, and agents, harmless against and from any and all claims arising during the Term and based upon any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or arising from any act or neglect of Tenant, its agents, servants, employees, licensees, or contractors, or arising, from any accident, injury or damage whatsoever caused to any person, firm or corporation occurring during the Term in or about the Premises, and from and against all costs, attorneys' fees, expenses and liabilities incurred in or with respect to any such claim or action or proceeding brought thereon. To the fullest extent allowed by law, Landlord, at all times, shall indemnify, defend and hold Tenant, its officers, directors, employees, and agents, harmless from and against any and all claims by or on behalf of any person or persons, firm or firms, corporation or corporations, arising from the conduct or management of, or from any work or things whatsoever done in or about, the Premises to the extent arising out of Landlord's negligence or other wrongful conduct, and further will indemnify, defend and hold Tenant, its officers, directors, employees, and agents harmless against and from any and all claims arising during the Term and based upon any breach or default on the part of Landlord in the performance of any covenant or agreement on the part of Landlord to be performed pursuant to the terms of this Lease, or arising from any act or neglect of Landlord, its agents, servants, employees, licensees or contractors, whenever and wherever occurring or arising from any accident, injury or damage whatsoever caused to any person, firm or corporation occurring prior to or after the Term in or about the Premises, and from and against all costs, attorneys' fees, expenses and liabilities incurred in connection with any such claim or action or a proceeding brought thereon.

19.2     All notices, demands and requests which may not be or are required to be given, demanded or requested by either party to the other shall be in writing. All notices, demands and requests by Landlord to Tenant

shall be sent by United States registered or certified mail, postage prepaid, or by commercial overnight delivery service or other personal delivery service (with evidence or receipt), or by electronic transmission, addressed as follows:

SSP America, Inc.
20408 Bashan Drive, Suite 300
Ashburn, VA 20147
Attention: Pat Murray

Patrick.Murray@foodtravelexperts.com

SSP America, Inc.
20408 Bashan Drive, Suite 300
Ashburn, VA 20147
Attention: Jag Singh

Jag.Singh@foodtravelexperts.com

Venable LLP
600 Massachusetts Avenue NW
Washington, DC 20001
Attention: Jennifer J. Bruton, Esq.
JJBruton@Venable.com

with a copy to Tenant at the Premises or at such other place as Tenant may from time to time designate by written notice to Landlord. All notices, demands and requests by Tenant to Landlord shall be sent by United States registered or certified mail, postage prepaid, or by commercial overnight delivery service or other personal delivery service (with evidence of receipt), addressed to Landlord as follows:

Seagis JFK LLC
One Tower Bridge – Suite 350
West Conshohocken, PA 19428
Attention: Charlie Lee

or at such other place as Landlord from time to time may designate by written notice to Tenant. Notices, demands and requests which shall be served upon Landlord by Tenant, or upon Tenant by Landlord, by mail in the manner aforesaid, shall be deemed served or given upon delivery or refusal.

19.3     Landlord covenants and agrees that Tenant, upon paying the Rent, and upon observing and keeping the covenants, agreements and conditions of this Lease on its part to be kept, observed and performed, shall lawfully and quietly hold, occupy and enjoy the Premises and Common Areas (subject to the provisions of this Lease) during the Term (as it may be extended from time to time as expressly provided herein) without hindrance or molestation by Landlord or by any person or persons claiming under Landlord.

19.4     Tenant and Landlord, each without charge at any time and from time to time, within twenty (20) days after written request by the other party, shall certify by written instrument, duly executed, acknowledged and delivered to any Mortgagee, assignee of a Mortgagee, proposed Mortgagee, or to any purchaser or proposed purchaser or transferee of Landlord, Tenant, or the Premises or any interest therein:

19.4.1     that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect, as modified, and identifying the modifications);

19.4.2     the amount of Base Rent and Additional Rent then being paid and the dates to which the Rent has been paid in advance;

19.4.3  whether or not there is any existing or alleged any breaches or defaults committed by the Landlord, or otherwise existing under this Lease, and specifying in detail such breach or default, if any, or any set-offs or defenses against the enforcement of any covenant, condition, provision, term or agreement of this Lease, as the case may be, to be performed or complied with (and, if so, specifying the same and the steps being taken to remedy the same);

19.4.4  that Tenant has made no advancements to or on behalf of Landlord for which it has the right to deduct from, or offset against, future Rent payments;

19.4.5  Tenant has accepted the Premises and is in full and complete possession thereof;

19.4.6  the Commencement Date and the Termination Date; and

19.4.7  such other statements or certificates as Landlord or any Mortgagee may reasonably request.

19.5  Neither party shall record this Lease or a memorandum of this Lease.

19.6  Tenant shall not use the Premises for any other use or purpose other than the "Intended Use" without the prior written consent of Landlord, which consent will not be unreasonably withheld or delayed or conditioned upon payment or any consideration (except payments or consideration to be paid under this Lease). In the event, subsequent to the Effective Date, Tenant proposes to change the use of the Premises to other than the Intended Use and Landlord had previously granted to either a tenant within the Development, or a purchaser of a parcel within the Development, or if Landlord is currently negotiating with a proposed Tenant or owner, either an exclusive use ("Exclusive Use") or an agreement of restrictive covenant or covenants ("Covenants"), Tenant shall not be permitted to use the Premises in such a manner that would cause a violation of such Exclusive Use or Covenants. In determining whether to permit any proposed New Use, the Landlord may consider, without limitation: (a) the effect or possible effect upon other tenants and owners in the Development; (b) the use of hazardous, toxic or dangerous materials; (c) parking requirements; (d) damage or alterations, or potential damage or alterations to the Premises; or (e) the effect or potential effect upon future sales or leases within the Development. If any covenant, condition, provision, term or agreement of this Lease shall, to any extent, by held invalid or unenforceable, the remaining covenants, conditions, provisions, terms and agreements of this Lease shall not be affected thereby, but each covenant, condition, provision, term or agreement of this Lease shall be valid and in force to the fullest extent permitted by law. This Lease shall be construed and be enforceable in accordance with the laws of the State of New York applicable to agreements made, and to be wholly performed, with such state.

19.7  The covenants and agreements herein contained shall bind and inure to the benefit of Landlord and its successors and assigns, and Tenant and its successors and assigns.

19.8  The caption of each article of this Lease is for convenience and reference only and in no way defines, limits or describes the scope or intent of such article or of this Lease.

19.9  This Lease does not create the relationship of principal and agent, or of partnership, joint venture, or of any association or relationship between Landlord and Tenant, the sole relationship between Landlord and Tenant being that of landlord and tenant.

19.10  All prior and contemporaneous negotiations are merged into and incorporated in this Lease. This Lease contains the entire agreement between the parties and shall not be modified or amended in any manner except by an instrument in writing executed by the parties hereto. Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease or in any other written agreement which may be made between the parties concurrently with the execution and delivery of this Lease and shall expressly refer to this Lease.

19.11  There shall be no merger of this Lease or the leasehold estate created by this Lease with any other estate or interest in the Premises by reason of the fact that the same person, firm, corporation or other entity may

acquire, hold or own directly or indirectly, (a) this Lease or the leasehold interest created by this or any interest therein, and (b) any other estate or interest in the Premises or any portion thereof. No such merger shall occur unless and until all persons, firms, corporations or other entities having an interest (including a security interest) in (1) this Lease or the leasehold estate created hereby, and (2) any such other estate or interest in the Premises or any portion thereof, shall join in a written instrument expressly effecting such merger and shall duly record the same.

19.12    All obligations, monetary or otherwise, accruing prior to expiration of the Term (as it may be extended from time to time) shall survive the expiration or other termination of this Lease.

19.13    Time is of the essence of this Lease, and all provisions relating thereto shall be strictly construed.

19.14    Each party represents and warrants to the other that the only broker, finder or other agent each has used in connection with this agreement and the transaction contemplated hereby is and has been NAI Long Island (the "Broker"). Each party agrees to indemnify the other party for any claim for brokerage commission or finder's fee asserted by a person, firm or corporation other than the Broker claiming to have been engaged by the indemnifying party. Landlord agrees to pay the Broker a brokerage commission upon execution of this agreement in accordance with its agreement with the Broker.

19.15    To the extent either party indemnifies and agrees to defend the other under the terms of this Lease, the indemnifying party shall have the right to select counsel to undertake such defense, which counsel shall be reasonably acceptable to the indemnified party.

19.16    Intentionally Omitted.

19.17    This Lease may be executed in counterparts, each of which when taken together shall constitute one instrument.

19.18    Wherever in this Lease Landlord's consent or approval is required, if Landlord shall refuse such consent or approval, Tenant in no event shall be entitled to make, nor shall Tenant make, any claim, and Tenant hereby waives any claim, for money damages (nor shall Tenant claim any money damages by way of set-off, counterclaim or defense) based upon any claim or assertion by Tenant that Landlord unreasonably withheld or unreasonably delayed its consent or approval. Tenant's sole remedies shall be an action or proceeding to enforce any such provision, for specific performance, injunction or declaratory judgment or for a determination as to whether Landlord reasonably withheld its consent pursuant to either (i) the Simplified Procedure For Court Determination of Disputes as set forth in the New York Civil Practice Law and Rules §3031 et seq. (or any successor thereto), or (ii) arbitration under the Expedited Procedures provisions (presently Rules E-1 through E-10, as same may be amended from time to time) of the American Arbitration Association (or successor thereto) in the City of New York (and the fees and expenses of such arbitration shall be borne by the unsuccessful party), and, if Tenant elects either (i) or (ii) above, the decision shall be final and conclusive on the parties.

19.19    This Lease represents the product of the joint negotiation, preparation and agreement of and between the parties hereto and is not to be construed against one party or the other as the principal drafter.

19.20    If any of the provisions of this Lease, or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

19.20    The time for the performance of any act required to be done by either party shall be extended by a period equal to any delay caused by or resulting from act of God, war, terrorism, civil commotion, fire, casualty, labor difficulties, shortages of labor or materials or equipment, governmental regulation, a restraint of law (e.g. injunctions, court or administrative orders or a legal moratorium imposed by a governmental authority), act or default of the other party, or other causes beyond such Party's reasonable control (which shall not, however, include the availability of funds or the inability to make any payment of money due hereunder), whether such time be designated by a fixed date, a fixed time or otherwise.

## ARTICLE 20
## LANDLORD'S REPRESENTATIONS AND
## WARRANTIES

In addition to the other representations and warranties made herein, Landlord hereby represents and warrants to Tenant that as of the date hereof the following representations and warranties are true, correct and complete and that the same will be true, correct and complete on and as of the Commencement Date:

20.1    Landlord is the owner of the Premises in fee simple; and

20.2    Landlord has full power, right and authority to enter into this Lease and to perform each and all of the terms, provisions, covenants, agreements, matters and things herein provided to be performed by Landlord, and to execute and deliver all documents provided hereunder to be executed and delivered by Landlord; and this Lease does not, nor does or will the performance by Landlord of its obligations hereunder, contravene any provision of law or any covenant, indenture or agreement binding upon Landlord, upon the Premises or upon the Land.

## ARTICLE 21
## RADON GAS

Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in New York. Additional information regarding radon and radon testing may be obtained from your county public health unit. Notwithstanding the foregoing, Landlord represents that, to Landlord's knowledge, no radon has been discovered in the Building.

## ARTICLE 22
## EXCULPATION

Except as expressly stated to the contrary in this Lease, no enforceable default on the part of the Landlord shall be deemed to have occurred unless Tenant shall have given Landlord notice of such default in which Tenant shall specify the default, and Landlord shall have failed to have remedied such default within thirty (30) days of the date thereof; provided, however if such default is of a nature that it cannot reasonably be cured within said period, then no enforceable default will be deemed to have occurred so long as Landlord is diligently pursuing the cure thereof (such additional period not to exceed sixty (60) days). Except as expressly stated to the contrary in this Lease, or where Tenant's remedies are expressly stated, Tenant's sole remedies shall be to seek damages or specific performance and Landlord shall in no event be liable for consequential damages. Tenant agrees that it shall look solely to the estate and property of Landlord in the Premises for the collection of any judgment (or any other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants, and conditions of this Lease to be observed and performed by Landlord and no other property or estates of Landlord or the entities comprising Landlord shall be subject to levy, execution, or other enforcement procedures for the satisfaction of Tenant's remedies.

## ARTICLE 23
## TRANSFER OF LANDLORD'S INTEREST

In the event of any transfer or transfers of Landlord's interest in the Premises, provided the transferee assumes in writing Landlord's obligations and liabilities under this Lease accruing from and after the date of such transfer, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer. All of the provisions of this Lease shall bind and inure to the benefit of the parties hereto, and their respective heirs, legal representatives, successors, and assigns.

## ARTICLE 24
## WAIVER

The waiver by Landlord of any breach of any term, covenant, or condition herein contained shall not be deemed to be a waiver of such term, covenant, or condition or any subsequent breach of the same or any other term,

covenant, or condition herein contained. The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant, or condition of this Lease, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent. No covenant, term, or condition of this Lease shall be deemed to have been waived by Landlord, unless such waiver be in writing by Landlord. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity. No receipt of money by Landlord from Tenant or a person acting on behalf of Tenant after the cancellation or termination hereof shall (a) reinstate, continue or extend the Term, (b) affect any notice theretofore given to Tenant, (c) operate as a waiver of a right of Landlord to enforce payment of Base Rent or Additional Rent due or thereafter falling due, or (d) operate as a waiver of the right of Landlord to recover possession of the Premises or pursue any other remedy in this Lease or at law provided.

## ARTICLE 25
## ATTORNEYS' FEES AND COSTS

If, as a result of any breach or default in the performance of any of the provisions of this Lease, either party hereto uses the services of an attorney in order to secure compliance with such provisions or recover damages therefor, and litigation results, then in such event, the prevailing party in such litigation shall be entitled to recover from the nonprevailing party herein reasonable court costs and attorneys' fees for both trial and appellate proceedings.

## ARTICLE 26
## RENT PROVISION

Notwithstanding anything that may be contained in this Lease to the contrary, no provision in this Lease shall be interpreted so as to have the effect of providing for payment of Rent, or any increment thereof, based in whole or in part on the income, net revenues, net income, or profits derived by Tenant from the Premises, but may, if applicable, be construed to provide for Rent, gross receipts or sales or otherwise included in the term "rents from real property" as such term is defined in Section 856(d) of the Internal Revenue Code. Further, no assignment of this Lease, or sublet under this Lease, will be approved if the effect thereof shall result in payment to Landlord of rental based in whole or in part on the income, net revenues, net income, or profits derived by Tenant, Tenant's assignee or Tenant's subtenant from the Premises, but may, if applicable, result in payment to Landlord of rental based in part on a fixed percentage of gross receipts or sales or otherwise included in the term "rents from real property" as such term is defined in Section 856(d) of the Internal Revenue Code. All documents relating to any permitted assignment or sublet shall refer to this restriction.

## ARTICLE 27
## WAIVER OF JURY TRIAL

THE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE PAYMENT OR NONPAYMENT OF RENT OR ADDITIONAL RENT. IN THE EVENT LANDLORD COMMENCES ANY PROCEEDINGS FOR NONPAYMENT OF RENT OR ADDITIONAL RENT, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING, UNLESS THE FAILURE TO RAISE THE SAME WOULD CONSTITUTE A WAIVER THEREOF. THIS SHALL NOT, HOWEVER, BE CONSTRUED AS A WAIVER OF TENANT'S RIGHT TO ASSERT SUCH CLAIMS IN ANY SEPARATE ACTION BROUGHT BY TENANT.

## ARTICLE 28
## OFAC

Tenant and Landlord each represent and warrant that neither it nor any of its officers or directors is, and that, to the actual knowledge of the signatory for each of Tenant and Landlord to this Lease, none of its employees,

representatives, or agents is, a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental regulation, and that it will not transfer this Lease to, or knowingly contract with or otherwise engage in any dealings or transactions or be otherwise associated with such persons or entities. Tenant and Landlord each represent and warrant that it is currently in compliance with the regulations of OFAC and any other governmental requirement relating thereto. Tenant and Landlord each hereby covenant that it will, at all times during the term of the Lease, remain in compliance with the regulations of OFAC and any other governmental requirement relating thereto.

## ARTICLE 29
## FINANCIAL STATEMENTS

Within ten (10) days following the request of Landlord, at any time during the Term that Tenant is not a "publicly traded company" (i.e., ownership interests are listed on a public securities exchange), but not to exceed more than once per year except in the case of a sale of the Building or any future financing, then Tenant shall furnish to Landlord a financial statement, in form and substance satisfactory to Landlord, showing the complete results of such entity's operations for its immediately preceding fiscal year, certified as true and correct by a certified public accountant and prepared after audit in accordance with generally accepted accounting principles applied on a consistent basis from year to year.

## ARTICLE 30
## ANTI-BRIBERY AND ANTI-CORRUPTION

Landlord and Tenant each agree, as to itself, that it shall, and shall ensure that its employees and subsidiaries providing services on its behalf in connection with this Lease shall comply with applicable anti-bribery and corruption laws including, without limitation, the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, and in particular, shall not, either directly or indirectly, offer, promise, give, authorize the payment of, or transfer, a financial or other advantage:

(a)     to any public or government official in order to obtain or retain business and with the intention of influencing such official in his or her capacity as an official where such official is not permitted by law to be influenced by the offer, promise or gift; or

(b)     to any other person with the intention of inducing or rewarding the improper performance of a function or activity.

**IN WITNESS WHEREOF**, each of the parties has caused this Lease to be duly executed as of the day and year first above written.

LANDLORD:

SEAGIS JFK LLC, a Delaware limited liability company

By:

Its: *Charles Lee*

*Authorized Signatory*

TENANT:

SSP AMERICA, INC.

By:

Its: *Patrick Murray*

*Executive Vice President*

# Cellar



# First Floor



**FIRST FLOOR**

David J. Millner, Architects
492 Arlington Road
Cedarhurst, NY 11516

165-35 145th Drive
Jamaica, NY, 11434

NAI Long Island

SEAGIS
JANUARY 27 2016

## Second Floor





NORTH

**EXHIBIT A-1**

**PARKING AREA**

(attached)

31

# Site Plan



**EXHIBIT B**

**IMPROVEMENTS**

1. Deliver all mechanical systems serving the Premises including plumbing to all bathrooms and the fixtures contained therein, heating, office HVAC only, fire sprinkler system, rolling doors and man doors, and freight elevators, electrical lighting and dumb waiter in working order.

2. Remove shipping container from truck court.

3. Remove any paint, cleaning and chemical containers/materials.

4. Deliver Premises power washed clean.

# EXHIBIT C

## RULES AND REGULATIONS

1. The sidewalks, entrances, passages, courts, vestibules, stairways, corridors or halls shall not be obstructed or used for any purpose other than ingress and egress. The halls, passages, entrances, stairways, balconies and roof are not for the use of the general public, and Landlord shall in all cases retain the right to control or prevent access thereto by all persons whose presence in the judgment of Landlord shall be prejudicial to the safety, character, reputation or interests of Landlord and its tenants, provided that nothing herein contained shall be construed to prevent such access by persons whom the tenant normally deals in the ordinary course of its business unless such persons are engaged in illegal activities. No tenant and no employees of any tenant shall go upon the roof of the building without the written consent of Landlord.

2. No awnings or other projections shall be attached to the outside walls or surfaces of the Building. Skylights, windows, and doors shall not be covered or obstructed by Tenant, and Tenant shall not install any window covering which would affect the exterior appearance of the Building, except as approved in writing by Landlord. Bottles, parcels, or other articles shall not be placed on the windowsills. Tenant shall not remove, without Landlord's prior written consent, any shades, blinds or curtains in the Premises.

3. No sign, picture, plaque, advertisement, notice or other material shall be exhibited, painted, inscribed or affixed by any Tenant on any part of, or so as to be seen from the outside of, the premises or building without the prior written consent of Landlord. Tenant shall conform to the building sign specifications at Tenant's sole cost. In the event of the violation of the foregoing by any tenant, Landlord may remove the same without any liability, and may charge the expense incurred in such removal to the tenant violating this rule. Tenant must, upon termination of this tenancy, remove such signage and repair any damage.

4. The toilet and wash basins and other plumbing fixtures shall not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags, or other substances shall be thrown therein. All damage resulting from any misuse of the fixtures shall be borne by the tenant who, or whose servants, employees, agents, visitors or licenses, shall have caused the same.

5. No tenant or its officers, agents, employees or invitees shall mark, paint, drill into, or in any way deface any part of the Premises or the Building. No boring, cutting or stringing of wires or laying of linoleum or other similar floor coverings shall be permitted except with the prior written consent of Landlord and as Landlord may direct.

6. The Premises shall not be used for gambling, lodging, or sleeping or for any immoral or illegal purposes.

7. No tenant or its officers, agents, employees or invitees shall make, or permit to be made any unseemly or disturbing noises, odors, sounds or vibrations or disturb or interfere with occupants of this or neighboring buildings or premises or those having business with them whether by the use of any musical instrument, radio, unusual noise, or in any other way.

8. Tenant shall not maintain armed security in or about the Premises nor possess any weapons, explosives, combustibles or other hazardous devices in or about the Building and/or Premises.

9. No Tenant or its officers, agents, employees or invitees shall at any time use, bring or keep upon the Premises any inflammable, combustible, explosive foul or noxious fluid, chemical or substance, or do or

permit anything to be done in the leased Premises, or bring or keep anything therein, which shall in any way increase the rate of fire insurance on the Building, or on the property kept therein, or obstruct or interfere with the rights of other tenants, or conflict with the regulations of the Fire Department or the fire laws, or with any insurance policy upon the Building, or any part thereof, or with any rules and ordinances established by the Board of Health or other governmental authority.

10. Tenant shall have the right, at Tenant's sole risk and responsibility, to use only Tenant's share of the parking spaces at the Property as set forth in the Lease. Tenant shall comply with all parking regulations promulgated by Landlord from time to time for the orderly use of the vehicles parking areas, including without limitation the following: Parking within the portion of the common parking lot allocated to Tenant shall be limited to automobiles, passenger or equivalent vans, motorcycles, and light four wheel pickup trucks and (in designated areas) bicycles, but Landlord acknowledges that Tenant may park (overnight or otherwise) large commercial vehicles in the fenced yard area. Parked vehicles shall not be used for vending or any other business or other activity while parked in the parking areas. Vehicles shall be parked only in striped parking spaces, except for loading and unloading, which shall occur solely in zones marked for such purpose, and be so conducted as to not unreasonably interfere with traffic flow within the Property or with loading and unloading areas of other tenants. All vehicles entering or parking in the parking areas shall do so at owner's sole risk and Landlord assumes no responsibility for any damage, vandalism or theft. Any vehicle which violates the parking regulations may be cited, and towed at the expense of the owner.

11. Tenant shall use designated trash receptacle(s) only in proximity to the Building and Premises, and shall not discard bulk trash, pallets, furniture, etc. in any of the Building's trash receptacles. If at any time during the term of this Lease, (in Landlord's sole and absolute discretion), Tenant over utilizes or exceeds a normal volume of trash and debris, then Tenant at its sole cost and expense shall arrange for a separate trash receptacle to be placed within the Premises. If at Tenant's request, Landlord consents to Tenant having a dumpster at the Property, Tenant shall locate the dumpster in the area designated by Landlord and shall locate the dumpster in the area designated by Landlord and shall keep and maintain the dumpster clean and painted with lids and doors in good working order.

12. No additional locks or bolts of any kind shall be placed upon any of the doors or windows by any tenant, nor shall any changes be made in existing locks or the mechanism thereof. Each tenant must, upon the termination of this tenancy, restore to Landlord all keys of offices and toilet rooms, either furnished to, or otherwise procured by, such tenant and in the event of the loss of any keys so furnished, such tenant shall pay to Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such change.

13. Tenant and its employees, agents, subtenants, contractors and invitees shall comply with all applicable "no smoking" ordinances and, irrespective of such ordinances, shall not smoke or permit smoking of cigarettes, cigars or pipes outside of Tenant's Premises in any portions of the Building except areas specifically designated as smoking areas by Landlord.

14. Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

15. Landlord reserves the right to make such other and further reasonable rules and regulate in its judgment may from time to time be needed for the safety, care, and cleanliness of the Premises, and for the preservation of good order therein, provided such rules are not in conflict with the terms of the Lease, and

any such other or further rules and regulations shall be binding upon the parties hereto with the same force and effect as if they had been inserted herein at the time of the execution hereof.

16. Tenant will secure Landlord's written approval before any business related items are stored outside the Tenant's premises. Outside overnight storage of business related vehicles must have prior written approval by Landlord.

**EXHIBIT D**

**<u>FORM OF LETTER OF CREDIT</u>**

(attached)

ISSUING BANK:
PNC BANK, NATIONAL ASSOCIATION
500 FIRST AVENUE, 2ND FLOOR
PITTSBURGH, PA. 15219


BENEFICIARY:                                          APPLICANT:
SEAGIS JFK LLC                                        SSP America Inc.

One Tower Bridge                                      20408 Bashan Drive, Suite 300

Suite 350 West Conshohocken,                          Ashburn, VA 20147
PA 19428
Attn Charlie Lee


IRREVOCABLE STANDBY LETTER OF CREDIT

OUR REFEERENCE:
AMOUNT:           USD
ISSUE DATE:       1st DECEMBER 2018
EXPIRY DATE:      1ST DECEMBER 2019
EXPIRY PLACE:     OUR COUNTERS IN PITTSBURGH, PA.


WE HEREBY ESTABLISH OUR CLEAN IRREVOCABLE STANDBY LETTER OF CREDIT NO.
_____ IN YOUR FAVOR FOR THE ACCOUNT OF (NAME OF APPLICANT) UP TO THE
AGGREGATE AMOUNT OF US$75,000.00 AVAILABLE FOR PAYMENT AT OUR COUNTERS AT 500
FIRST AVENUE, 2ND FLOOR, PITTSBURGH, PA 15219 AGAINST PRESENTATION OF YOUR
DRAFT(S) DRAWN AT SIGHT ON PNC BANK, NATIONAL ASSOCIATION, ACCOMPANIED BY
YOUR DATED STATEMENT SIGNED BY AN AUTHORIZED OFFICER OF THE BENEFICIARY
READING AS FOLLOWS:

"I, (INSERT NAME AND TITLE) HEREBY CERTIFY THAT I AM AN AUTHORIZED OFFICER OF
THE BENEFICIARY, AND I FURTHER CERTIFY THAT THE APPLICANT (INSERT COMPLETE
NAME)1) HAS APENDING BANKRUPTCY PROCEEDING OR 2) AN EVENT OF DEFAULT BY
TENANT HAS OCCURRED UNDER THIS LEASE BEYOND APPLICABLE NOTICE AND CURE
PERIODS AND THEREFORE, WE ARE ENTITLED TO DRAW UNDER PNC BANK, NATIONAL
ASSOCIATION, LETTER OF CREDIT NO._____ FOR USD ($INSERT AMOUNT)."


DRAFTS DRAWN UNDER THIS LETTER OF CREDIT MUST BE MARKED: "DRAWN UNDER PNC
BANK, NATIONAL ASSOCIATION LETTER OF CREDIT NO. _____."

THIS LETTER OF CREDIT EXPIRES AT THIS OFFICE ON 1ST DECEMBER 2019.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT WILL AUTOMATICALLY BE
EXTENDED, WITHOUT AMENDMENT FOR AN ADDITIONAL PERIOD OF ONE (1) YEAR FROM THE
PRESENT OR ANY FUTURE EXPIRATION DATE, UNLESS WE NOTIFY YOU IN WRITING BY
CERTIFIED MAIL, OR OVERNIGHT COURIER, SENT TO YOU AT THE ABOVE ADDRESS AT
LEAST SIXTY (60) DAYS PRIOR TO THE THEN PRESENT EXPIRATION DATE, NOTIFYING

YOU THAT WE ELECT NOT TO EXTEND THIS LETTER OF CREDIT FOR AN ADDITIONAL
PERIOD OF ONE YEAR.


IN THE EVENT YOU RECEIVE SUCH NON RENEWAL NOTICE, YOU MAY DRAW AT ANY TIME
PRIOR TO THE THEN CURRENT EXPIRATION DATE, UP TO THE FULL AMOUNT THEN
AVAILABLE HEREUNDER AGAINST YOUR DRAFT(S) AT SIGHT, DRAWN ON US ACCOMPANIED
BY YOUR DATED STATEMENT SIGNED BY AN AUTHORIZED OFFICER OF THE BENEFICIARY
READING AS FOLLOWS:

"I, (INSERT NAME AND TITLE) HEREBY CERTIFY THAT I AM AN AUTHORIZED OFFICER OF
THE BENEFICIARY, AND I FURTHER CERTIFY THAT PNC BANK, NATIONAL ASSOCIATION
HAS PROVIDED WRITTEN NOTICE OF THEIR INTENT NOT TO EXTEND THEIR LETTER OF
CREDIT NO. _____, AND WE HAVE NOT RELEASED THE APPLICANT OF
THEIR LIABILITY WITH US, THEREFORE, THE OBLIGATION TO US REMAINS OUTSTANDING
AND WE ARE ENTITLED TO DRAW FOR USD($(INSERT AMOUNT)."


DRAFT(S) AND DOCUMENTS MAY BE PRESENTED TO OUR OFFICES AT PNC BANK, NATIONAL
ASSOCIATION, 500 FIRST AVENUE, 2ND FLOOR,PITTSBURGH, PA. 15219 TO THE
ATTENTION OF THE STANDBY LETTER OF CREDIT DEPARTMENT.

THIS LETTER OF CREDIT IS TRANSFERABLE IN ITS ENTIRETY BUT NOT IN PART AND MAY
BE SUCCESSIVELY TRANSFERRED.  THE ISSUING BANK ONLY IS AUTHORIZED TO ACT AS
THE TRANSFERRING BANK.  IN THE EVENT YOU WISH TO TRANSFER THIS LETTER OF
CREDIT, PLEASE CONTACT US VIA SWIFT AT PNCCUS33ENJ OR BY TELEPHONE AT 800-
682-4689 FOR OUR TRANSFER REQUEST FORM AND RETURN THE SAME TO US ALONG WITH
THE ORIGINAL LETTER OF CREDIT AND AMENDMENT(S), IF ANY. ALL COSTS FOR
TRANSFER ARE FOR ACCOUNT APPLICANT. THE CORRECTNESS OF THE SIGNATURE AND
TITLE OF THE PERSON SIGNING THE TRANSFER FORM MUST BE AUTHENTICATED BY YOUR
BANK.  IN CASE OF ANY TRANSFER UNDER THIS LETTER OF CREDIT, THE DRAFT AND ANY
REQUIRED STATEMENT MUST BE EXECUTED BY THE TRANSFEREE.  THIS LETTER OF CREDIT
MAY NOT BE TRANSFERRED TO ANY PERSON WITH WHICH U.S. PERSONS ARE PROHIBITED
FROM DOING BUSINESS UNDER U.S. FOREIGN ASSETS CONTROL REGULATIONS OR OTHER
APPLICABLE U.S. LAWS AND REGULATIONS.

THIS LETTER OF CREDIT IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES 1998,
INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 590.

WE HEREBY ENGAGE WITH YOU THAT DRAFT(S) DRAWN  UNDER AND IN COMPLIANCE WITH
THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT WILL BE DULY HONORED IF
PRESENTED TO US AT THIS OFFICE ON OR BEFORE THE EXPIRY DATE.

_____

PNC BANK, NATIONAL ASSOCIAION
GLOBAL TRADE SERVICE OPERATIONS

**EXHIBIT E**

**FORM OF SNDA**

(attached)

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

JPMorgan Chase Bank, N.A.
Attn. POST CLOSING
P.O. Box 9011
Coppell, TX 75019-9011
Loan No. _____

# SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made as of _____, 2018, by and among JPMORGAN CHASE BANK, N.A. (together with its successors and assigns, "Lender"), SEAGIS JFK LLC, a Delaware limited liability company ("Borrower"), and SSP AMERICA, INC., a California corporation ("Tenant").

Borrower is the landlord and Tenant is the tenant under a lease dated _____ (as amended, the "Lease"). The Lease covers all or a portion (the "Leased Premises") of the real property described on the attached Exhibit A and the improvements thereon (the "Property"). Borrower has been granted, or has applied for, a loan by Lender (the "Loan"), secured by a deed of trust, mortgage or similar instrument (the "Security Instrument") encumbering the Property. All documents evidencing or securing the Loan including the Security Instrument are referred to as the "Loan Documents." Tenant has agreed to subordinate the Lease to the Security Instrument and other Loan Documents, and Lender has agreed not to disturb Tenant's rights under the Lease, in accordance with this Agreement. The parties agree as follows:

1. **Subordination.** The Lease is subordinate to the lien of the Security Instrument and all amendments thereto. Tenant agrees that, notwithstanding anything to the contrary in the Lease or any other document and notwithstanding Section 3 below: (a) no right of first refusal held by Tenant under the Lease is exercisable in connection with any Foreclosure Event (as defined below); and (b) no purchase option held by Tenant under the Lease can be exercised prior to any Foreclosure Event unless the Loan is paid off in full concurrently with the closing of such purchase.

2. **Attornment.** After any Foreclosure Event, the terms of the Lease will be recognized as a new and direct lease from Successor Landlord (as defined below) to Tenant, and Tenant hereby attorns to Successor Landlord as its landlord, such attornment to be effective and self-operative immediately upon such Foreclosure Event. Notwithstanding any other provision of this Agreement, Successor Landlord will not be (a) liable for any payment of rent more than 30 days before the due date under the Lease or deposit made by Tenant to Borrower or any prior landlord; or (b) liable for or bound by (i) any breach of the Lease by Borrower or any prior landlord (other than a landlord breach which Lender has written notice of and an opportunity to cure prior to commencing a Foreclosure Event or breaches of a continuing nature), (ii) any offset or credit Tenant may have against Borrower or any prior landlord (other than offsets or credits provided for in the Lease or due to a breach of the Lease by Borrower which Lender has written notice of and an opportunity to cure prior to commencing a Foreclosure Event); or (iii) any material modification of the Lease without Lender's written consent which consent shall not be unreasonably withheld, conditioned or delayed; or (iv) any right of first refusal and/or purchase option held by Tenant under the Lease.

"Foreclosure Event" means: (i) foreclosure under the Security Instrument; (ii) any other exercise by Lender of rights and remedies as a result of which a Successor Landlord becomes the owner of the Property; or (iii) delivery to Lender (or its designee or nominee) of a deed or other conveyance of the Property in lieu of (i) or (ii) above.

"Successor Landlord" means Lender or any other person or entity that becomes the owner of the Property as the result of, or after, a Foreclosure Event.

3. **Nondisturbance.** Upon a Foreclosure Event, Lender will not (and no other Successor Landlord will be entitled to) interfere with Tenant's use or possession of the Leased Premises; provided that if Tenant is then in default under the Lease beyond any applicable notice, grace or cure period, at Lender's option, the Lease shall be terminated by the Foreclosure Event.

4. **Other Acknowledgments and Agreements.** Tenant acknowledges and agrees that: (a) upon receipt of written notice from Lender that the Loan is in default, Tenant will (and Borrower authorizes Tenant to) pay all rent and other amounts due to Borrower under the Lease directly to Lender; (b) Lender has no obligation to Tenant regarding Borrower's application of the Loan proceeds; (c) Tenant shall notify Lender in writing of any default by Borrower under the Lease to which Tenant provides written notice thereof to Borrower; and (d) if Lender becomes the Successor Landlord, Lender shall have no liability to Tenant with respect to the Lease after Lender no longer has any ownership interest in the Property, except to the extent such liability arises solely by acts or omissions of Lender during the period of Lender's ownership of the Property.

5. **Notices.** All notices under this Agreement will be in writing and mailed or delivered by recognized overnight delivery service (such as Federal Express) to the addresses shown on the signature page. All such notices will: (a) if mailed, be effective three (3) business days following deposit in the United States mail with postage prepaid and return receipt requested; and (b) if delivered as provided above, be effective upon delivery. Any party to this Agreement may change the address for notices to that party by written notice to the other parties to this Agreement.

6. **WAIVER OF SPECIAL DAMAGES.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO AGREES NOT TO ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST THE OTHER PARTIES HERETO, ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT.

7. **WAIVER OF JURY TRIAL.** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

8. **Miscellaneous.** This Agreement will inure to the benefit of and be binding upon the parties hereto and their successors and assigns. This Agreement constitutes the final expression of the entire agreement of the parties with respect to the subordination of the Lease to the lien of the Security Instrument and the other matters addressed in this Agreement. If there are any conflicts between the Security Instrument and the Lease, the Security Instrument, in the form of record as of the date hereof,

shall control; provided, however, that if Tenant is not in default under the Lease beyond any applicable notice, grace or cure period at the time such proceeds are received, then the Lease shall control with respect to the disbursement of insurance proceeds received following a casualty event and proceeds of any condemnation or threatened condemnation of all or any portion of the Property. This Agreement may not be modified other than by an agreement in writing, signed by the parties hereto or their respective successors in interest. Except as modified by this Agreement, all of the terms and provisions of the Lease will remain in full force and effect.  If there are any conflicts between the Lease and this Agreement, the terms and provisions of this Agreement will control.  This Agreement may be executed in any number of identical counterparts, which shall collectively constitute one agreement. This Agreement shall be governed by the laws of the state where the Property is located, except to the extent preempted by federal laws applicable to national banks. In the event of any litigation to enforce the terms of this Agreement or to recover damages for the breach thereof, the prevailing party will be entitled to recover from the nonprevailing party all attorneys' fees and other costs and expenses incurred in connection therewith.

[Signatures on the following page]

DATED as of the day and year first above written.

**LENDER:**
JPMORGAN CHASE BANK, N.A.

By: _____
Name: _____
Title: _____

Address:
P.O. Box 9178
Coppell, TX 75019-9178
Attn: Portfolio Administration – Transactions
Loan No. _____

**BORROWER:**
SEAGIS JFK LLC,
a Delaware limited liability company

By: _Tx E McK_____
Name: _Timothy E McKenna_____
Its _Authorized Signatory_____

Address:
One Tower Bridge
100 Front Street – Suite 350
West Conshohocken, PA 19428
Attention: Charlie Lee

**TENANT:**
SSP AMERICA, INC.,
a California corporation

By: _____
Name: _Patrick Murray_____
Its _Executive Vice President_____

Address:
20408 Bashan Drive, Suite 300
Ashburn, VA 20147
Attention: Jag Singh

STATE OF_____ )
                                   )   ss.
COUNTY OF_____ )

On this _____ day    of December, 2018, before me personally    came _____, known by me, or proved to me by satisfactory evidence, to be the person who executed the foregoing instrument and who, being duly sworn by me, did depose and say that he/she executed the foregoing instrument in his/her capacity as _____of JPMORGAN CHASE BANK, N.A. and that he/she was authorized to execute the foregoing instrument on behalf of said entity and executed the instrument as the as act and deed of said entity for the uses and purposes therein mentioned.

_____

_____
*(Type or print name)*

                                              Notary Public
                                      State of _____


STATE OF _Pennsylvania_____ )
                                )   ss.
COUNTY OF _Montgomery_____ )

On this _5th_ day    of December, 2018, before me personally    came _Timothy E McClew_ known by me, or proved to me by satisfactory evidence, to be the person who executed the foregoing instrument and who, being duly sworn by me, did depose and say that he/she executed the foregoing instrument in his/her capacity as _Authorized Signatory_ of SEAGIS JFK LLC, a Delaware limited liability company, and that he/she was authorized to execute the foregoing instrument on behalf of said entity and executed the instrument as the as act and deed of said entity for the uses and purposes therein mentioned.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Lorraine Daly, Notary Public
West Conshohocken Boro, Montgomery County
My Commission Expires May 16, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

_Lorraine Daly_

_Lorraine Daly_
*(Type or print name)*

                                              Notary Public
                                      State of _Pennsylvania_

1554068.v4

STATE OF _Virginia_ )

COUNTY OF _Loudoun_ )  ss.

On this **3rd** day    of December, 2018, before me personally    came **Patrick Murray** known by me, or proved to me by satisfactory evidence, to be the person who executed the foregoing instrument and who, being duly sworn by me, did depose and say that  he/she   executed   the foregoing   instrument   in  his/her  capacity  as **Exec. Vice Pres.** of SSP AMERICA, INC., a California corporation, and that  he/she  was  authorized  to  execute  the  foregoing  instrument  on  behalf of said entity and executed the instrument as the as act and deed of said entity for the uses  and purposes therein mentioned.



_Dorothy Kennedy_

_Dorothy Kennedy_
*(Type or print name)*

Notary Public
State of _Virginia_

# EXHIBIT A
## Description of the Property

ALL that certain lot, piece or parcel of land, situate, lying and being in the Borough and County of Queens, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of 145th Drive, formerly known as Madison Street and Excelsior Street, with the westerly side of 167th Street, formerly Masterson Avenue;

RUNNING THENCE northerly along the westerly side of 167th Street, 90 feet;

THENCE westerly at right angles to the westerly side of 167th Street, 190 feet;

THENCE southerly parallel with the westerly side of 167th Street, 90 feet to the northerly side of 145th Drive;

THENCE easterly along the northerly side of 145th Drive, 190 feet to the corner, the point or place of BEGINNING.

1554068.v4