# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SSP AMERICA, INC., <br><br>                     Plaintiff, <br><br>  v. <br><br>SEAGIS JFK LLC, <br><br>                     Defendant. | Case No. 1:21-cv-00475-ENV-RER <br><br> ECF Case <br><br> **AMENDED COMPLAINT** |

SSP America, Inc. brings this complaint against Seagis JFK LLC for fraud and breach of a commercial/industrial lease, seeking equitable relief and money damages, and for its complaint states as follows.

## PARTIES AND JURISDICTION

1. SSP America, Inc. ("SSP") is a corporation organized and existing under California law. SSP is the U.S. division of SSP Group, a global food travel provider. SSP is one of the nation's leading food and beverage concessionaires at airports across America.

2. SSP's principal place of business is at 20408 Bashan Drive, Suite 300, Ashburn, VA 20147.

3. Seagis JFK LLC ("Seagis") is a limited liability company organized and existing under Delaware law.

4. Seagis is an affiliate of Seagis Property Group LP.

5. Seagis Property Group LP owns and operates more than 11.5 million square feet of logistically driven warehouse space in markets in New York (Queens, Brooklyn, and Bronx), New Jersey, and Florida.

6. Seagis Property Group LP's principal place of business is One Tower Bridge, 100 Front Street, Suite 350, Conshohocken, PA 19428.

7. Seagis Property Group LP owns a substantial portfolio of warehouse and office buildings around JFK International Airport in Queens, New York, some of which are depicted at www.jfkwarehouse.com (last visited January 27, 2021).

8. Seagis is the owner of a warehouse located at 165-35 145th Drive, Jamaica, New York, near JFK International Airport. Seagis acquired the real property and its improvements in November 2016.

9. Seagis, as landlord, leased to SSP, as tenant, approximately 24,440 rentable square feet within the warehouse at 165-35 145th Drive.

10. A genuine and complete copy of the parties' Commercial/Industrial Building Lease dated December 5, 2018, as amended by the First Amendment to Lease dated July 15, 2019, is attached to this Amended Complaint as Exhibit A.

11. The parties are of diverse citizenship.

12. This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship between all plaintiffs and all defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject matter of this action is situated in the district.

## Facts

14. No later than July 2017, Seagis publicly listed the premises for lease as space appropriate for food preparation and storage, advertising the space as offering a hot kitchen, ovens, and refrigeration and freezer facilities.

15. Before Seagis leased the premises to SSP, the premises were leased to another food service provider.

16. Seagis engaged the services of NAI Long Island as its commercial real estate broker to market the premises and to negotiate on its behalf with prospective purchasers.

17. On August 23, 2018, at 4:58pm, Matthew Giugliano of NAI Long Island, as Seagis's agent, delivered to SSP's leasing agent, Thomas Maher, a marketing flyer that represented the premises as "AVAILABLE: Food Processing Facility."

18. A genuine and complete copy of Seagis's marketing flyer is attached to this Amended Complaint as Exhibit D.

19. The marketing flyer delivered by Giugliano to Maher specifically boasted that the premises were a "Level III SQF Facility." A Level III SQF means that the Safety Quality Food Institute, an industry standard bearer for food safety, has given the facility its highest rating and certification for food quality standards based on the applicant's (Seagis's) representations.

20. The marketing flyer describes the premises as including fixtures that service an operational food processing facility, including two 30hp Fulton boilers, a hot kitchen with Ansul system, a new blast chiller, frozen tunnel equipment with exterior nitrogen storage tank, double rack ovens by Sveba Dahlen, multiple refrigerated and freezer boxes, and anti-bacterial and water filtration systems.

21. Photographs included in the flyer depict many of the fixtures that are described in the narrative.

22. At the time that Seagis, through its broker, represented to SSP that the premises were available as a "Food Processing Facility," Seagis knew or should have known that the operation of its premises for food preparation and storage requires the premises to be free of health and safety hazards.

23. In the late summer of 2018, Seagis and SSP entered into lease negotiations. As a result of their negotiations, Seagis was aware that SSP is in the business of travel food service,

that SSP operates food concessions at JFK and LaGuardia Airports, and that SSP intended to use the premises as a commissary to prepare and store food for the JFK and LaGuardia Airport concessions.

24. The marketing flyer noted as a feature of the premises that the facility is "directly across from JFK Airport," indicating further that the site is 2 blocks from JFK Airport and 11 miles from LaGuardia Airport.

25. On August 27, 2018, at 11:04am, Giugliano delivered to Maher floor plans of the premises that show additional kitchen fixtures, including grease traps, walk in coolers, an air purifier room, soup kettle stations, ovens, range hoods, a vegetable prep station, chillers, sinks, a dumb waiter, a packaging area, and a large loading dock.

26. On August 31, 2018, at 4:43pm, Brian Pinnola, also an agent of Seagis's broker NAI Long Island, delivered to Maher and to two SSP employees, Paul Loupakos and Brian Willie, a letter of intent reflecting "revisions per your message below." In the message below, Maher, on behalf of SSP, required that the freight elevators, dumb waiter, refrigeration units, dock levelers, and lighting fixtures must be in good working order. Pinnola responded affirmatively. In the message below Maher, on behalf of SSP, also required that the landlord agree that it would be responsible for all structural elements of the building, calling out the roof and foundation. Pinnola responded affirmatively.

27. Seagis repeated its representations regarding the condition of the freight elevators and dumb waiter and the landlord's responsibility for the roof and structure of the building again on September 14, 2018, at 12:21pm, when Giugliano delivered a revised letter of intent to Maher.

28. During the lease negotiations, Seagis promised to make certain repairs necessary to render the premises suitable for use as a food commissary before delivering possession of the premises.

29. During the lease negotiations, Seagis promised to make certain repairs to the building and premises during the term of the lease, as necessary, in order to ensure the premises remains suitable for use as a food commissary.

30. All of the statements made by Seagis and its broker to SSP and its leasing agent, through the marketing materials and other correspondence, were made to induce SSP to enter into a lease with Seagis for the premises.

31. SSP signed the lease in reliance on Seagis's representations and promises.

32. In retrospect, it has become obvious that Seagis never intended to make repairs necessary for the premises to be useable as a food commissary.

33. If SSP had known that Seagis had no intention to make the building and premises suitable for use as a food commissary, SSP would never have signed the lease, paid rent, or invested over $2 million of its own funds in the premises.

34. The Commencement Date under the lease is December 1, 2018. Before delivery of possession on that date, section 1.2 of the lease obligates Seagis to make Improvements as defined in the lease and set forth in the scope of work attached as Exhibit B to the lease. Seagis's timely and satisfactory performance of its obligation was essential to render the premises suitable for use as a commissary.

35. For example, Exhibit B to the Lease requires Seagis to deliver the freight elevators and dumb waiter in working order on the Commencement Date, December 1, 2018. In fact, the freight elevators and dumb waiter when delivered were not in working order and required approximately $350,000 in repairs.

36. Further, as promised during the lease negotiations, throughout the term, the lease obligates Seagis to maintain and make repairs to certain portions of the building or premises. Section 7.1 of the lease requires Seagis to keep "the structure of the Building, including, without limitation, exterior walls, slab and roof of the Building," "in good repair and working order as a prudent owner" at "Landlord's sole cost and expense."

37. Seagis's timely and satisfactory performance of its obligation to maintain and make repairs to the structure of the building, including the roof and slab, was and is essential to render the premises suitable for use as a commissary.

38. In addition, in section 8.1 of the Lease, the landlord promised to repair, replace, or make improvements to the premises necessary to remedy any violations of or non-compliance with the law that existed as of the Commencement Date.

39. By executing and delivering to SSP the lease as of December 5, 2018, Charles Lee, the authorized signatory of Seagis, represented to SSP that Seagis had a present intention to honor its representations, promises, and obligations. In fact, Seagis had no such present intention, and Lee misrepresented Seagis's intent.

40. Almost immediately after SSP's taking possession, it became apparent that the building has significant structural defects and other problems that Seagis was supposed to, but did not, repair before delivering possession to SSP.

41. Within a month, leaks in the roof became apparent. The leaks rendered the premises unsuitable for food preparation, and mold grew as a result of the roof leaks. The mold discovered during the roof repair indicated that it had been there for some time. As a result, in July 2019, Seagis reimbursed SSP $29,516.77 to remediate mold that was Seagis's responsibility under the Lease. (Ex. A, Lease, at First Am.)

42. The floor slab was discovered to be structurally unsound, cracked, and unable to support the load of the ovens, making the condition of the premises unsuitable for use as a commissary.

43. The elevators functioned improperly, which posed a health and safety hazard, and numerous other problems gradually were revealed.

44. An architectural, structural, and engineering consultant that evaluated the condition of the building and premises in June 2020 concluded that there are numerous, substantial, and material defects in the structure and condition of the building and premises, including electrical, life and safety, fire protection, mechanical, and plumbing deficiencies, some of which are code violations, for which Seagis is responsible.

45. A genuine and complete copy of the consultant's report of the conclusions of its building evaluation is attached to this Amended Complaint as <u>Exhibit B</u>.

46. Estimates of the cost to bring the building up to the standard to which Seagis pretended to promise to deliver the premises range from $2 million to $3 million or more.

47. Most of the conditions noted in the consultant's report constitute breaches of Seagis's obligations to repair, maintain, or remedy under the lease.

48. Before SSP became aware of the extent to which the building and premises were defective upon delivery, SSP paid a substantial amount of rent and invested over $2 million to prepare the premises to be operated as a commissary, installing fixtures that have little value if SSP cannot operate the premises as intended.

49. The lease contemplates that SSP would begin to use the premises for its commissary operations on June 1, 2019. SSP remains unable to use the premises because of Seagis's false statement of its intention to deliver them in a suitable condition and to make repairs during the term of the lease.

50. After numerous informal communications and demands to bring the property up to standard by SSP directly or through its legal counsel, which started in 2019 and were in vain, SSP gave Seagis formal notice of default under the lease on April 4, 2020.

51. A genuine and complete copy of the April 4, 2020, notice of default is attached to this Amended Complaint as <u>Exhibit C</u>.

52. Seagis has been non-responsive to SSP's repeated demands, has not cured its defaults, and continually insists – directly contrary to the lease language – that SSP accepted the building in "as-is" condition.

53. After it became apparent that continued demands would be futile, SSP secured alternate space to operate a temporary commissary to support its food concessions at JFK and LaGuardia Airports and vacated the premises. However, the alternate space is more expensive and less efficient for SSP's commissary operation. SSP is conducting the same operations from the alternate space that it intended to conduct on the premises but at a greater expense to SSP than it would have incurred if it were operating on the premises.

54. The defects in the building and premises are so substantial, and were present (it appears in retrospect) when Seagis delivered possession of the premises, it is inconceivable that Seagis was unaware of the condition of the building, premises, and fixtures when it marketed the premises, negotiated with SSP, and entered into the lease.

55. The breadth and depth of the defects, the fact that they surfaced soon after SSP took possession, Seagis's non-responsiveness to SSP's demands, and Seagis's insistence that SSP accepted the premises in as-is condition (despite the lease language otherwise) are proof that Seagis knew of the defects but never had any intention of delivering or maintaining the premises or fixtures in the defect-free condition that Seagis represented to SSP.

## COUNT I

### (Fraud in the Inducement of Contract)

56. The allegations in paragraphs 1 through 55 above are hereby incorporated.

57. During lease negotiations, despite Seagis's representations otherwise, Seagis had no intention of delivering the premises in a condition suitable for operation of a food commissary.

58. Seagis knew that it had no intention of delivering the premises in a condition suitable for operation of a food commissary but nonetheless misled SSP into believing otherwise in order to induce SSP into signing the lease.

59. If SSP had known that Seagis had no intention of delivering the premises in a condition suitable for operation of a food commissary, and no intention of bringing the property to standard during the term of the lease, SSP would not have entered into the lease, paid rent, or made its own investments in the premises.

60. SSP reasonably relied on Seagis's misrepresentations and material omissions of fact, not knowing they were untrue, and entered into the lease.

61. SSP has suffered injury as a result of Seagis's misrepresentations and material omissions of fact.

## COUNT II

### (Breach of Contract)

62. The allegations in paragraphs 1 through 55 above are hereby incorporated.

63. Seagis's failure to deliver the premises and fixtures in the condition agreed upon in the lease is a breach of the lease and Seagis's lease obligations.

64. Seagis's failure to repair the premises or maintain the premises to standard during the term of the lease is a breach of the lease and Seagis's lease obligations.

65. SSP has suffered injury as a result of Seagis's breach of contract.

## **REQUEST FOR RELIEF**

WHEREFORE, SSP America, Inc. requests that the Court enter a judgment order in its favor, and against Seagis JFK LLC, as follows:

A. As to Count I, rescinding the lease and compelling Seagis to restore to SSP all monies paid to Seagis, for investment in the premises, or otherwise in reliance on Seagis's misrepresentations or, alternatively, awarding SSP a money judgment for compensatory damages as a result of Seagis's fraud, in excess of $3 million; and

B. As to Count I, awarding SSP punitive damages; and

C. As to Count II, awarding SSP a money judgment for compensatory damages as a result of Seagis's breach of contract, in excess of $3 million; and

D. As to both counts, awarding SSP its reasonable attorneys' fees, costs, and prejudgment interest.

Date: May 7, 2021          **VENABLE LLP**

       /s/ Caroline P. Gately
Michael M. Agosta
1290 Avenue of the Americas, 20th Floor
New York, NY 10104
(212) 503-0690
(212) 307-5598 (fax)
mmagosta@venable.com

Caroline Petro Gately
(admitted *pro hac vice*)
600 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 344-4744 phone
(202) 344-8300 fax
cpgately@venable.com

*Counsel for SSP America, Inc.*